**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1073 (AND CONSOLIDATED CASES)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

SINCLAIR WYOMING REFINING COMPANY LLC, ET AL.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*

*On Petitions for Review of Final Agency Actions
of the U.S. Environmental Protection Agency*

**PETITIONERS' FINAL JOINT OPENING BRIEF**

Eric D. McArthur
Peter C. Whitfield
Daniel J. Feith
Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
emcarthur@sidley.com

*Attorneys for Petitioners HF Sinclair
Refining & Marketing LLC, HF Sinclair
Cheyenne Refining LLC, HF Sinclair
Woods Cross Refining LLC, CHS Inc.,
Delek US Holdings, Inc., Lion Oil Company, LLC, Alon Refining Krotz
Springs, Inc., Delek Refining, Ltd.,
Cenovus Energy Inc., and Superior
Refining Company LLC*

Jonathan G. Hardin
Alexandra M. Bromer
Michael R. Huston
PERKINS COIE LLP
700 13th Street, N.W., Suite 800
Washington, D.C. 20005
(202) 654-6200
JHardin@perkinscoie.com

*Attorneys for Petitioners American
Refining Group, Inc., Calumet Montana
Refining, LLC, Calumet Shreveport
Refining, LLC, Ergon Refining, Inc.,
Ergon-West Virginia, Inc., Countrymark
Refining and Logistics, LLC, Hunt
Refining Company, Par Hawaii Refining,
LLC, U.S. Oil & Refining Company,
Wyoming Refining Company, Placid
Refining Company LLC, San Joaquin*

(additional counsel listed on inside cover)

Samuel P. Hershey
Thomas E Lauria
Andrew K. Gershenfeld
WHITE & CASE LLP
1221 Ave. of the Americas
New York, NY 10020
(212) 819-2699
sam.hershey@whitecase.com

*Attorneys for Petitioner Wynnewood
Refining Company, LLC*

Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-5800
Jeff.Holmstead@bracewell.com

*Attorneys for Petitioners Sinclair Casper
Refining Company LLC and Sinclair
Wyoming Refining Company LLC*

*Refining Co., Inc., and The San Antonio
Refinery LLC*

Ian S. Shelton
EVERSHEDS SUTHERLAND (US) LLP
500 Capitol Mall, Suite 1750
Sacramento, California 95814
Tel: (916) 245-7427
ianshelton@eversheds-sutherland.com

*Attorney for Petitioner Kern Oil
& Refining Co.*

Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW
Washington, DC 20036
(202) 861-1527
mdelaquil@bakerlaw.com

*Attorney for Petitioners Cross Oil
Refining & Marketing, Inc and
United Refining Company*

## CERTIFICATE AS TO PARTIES,
## RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a), the following is a statement of the parties, amici, rulings under review, and related cases:

## I.    Parties and Amici

### Petitioners:

Review of April 2022 Denial of Petitions

- Sinclair Wyoming Refining Company LLC, and Sinclair Casper Refining Company LLC, No. 22-1073

- HF Sinclair Refining & Marketing LLC; HF Sinclair Cheyenne Refining LLC; HF Sinclair Woods Cross Refining, LLC, No. 22-1075

- Delek US Holdings, Inc., No. 22-1100

- Cenovus Energy Inc., and Superior Refining Company LLC, No. 22-1102

- CHS, Inc., No. 22-1109

- Cross Oil Refining & Marketing, Inc., No. 22-1114

- United Refining Company, No. 22-1115

- Kern Oil & Refining Co., No. 22-1122

- Wynnewood Refining Company, LLC, No. 22-1124

- American Refining Group, Inc., Nos. 22-1128 and 22-1199

- Calumet Montana Refining, LLC, and Calumet Shreveport Refining, LLC, No. 22-1129

- Countrymark Refining and Logistics, LLC, Nos. 22-1130 and 22-1165

- Ergon Refining, Inc., No. 22-1131

- Hunt Refining Company, No. 22-1132

- Par Hawaii Refining, LLC; U.S. Oil & Refining Company; and Wyoming Refining Company, Nos. 22-1133 and 22-1219

- Placid Refining Company LLC, No. 22-1134

- San Joaquin Refining Co., Inc., No. 22-1135

<u>Review of June 2022 Denial of Petitions</u>

- Wynnewood Refining Company, LLC, No. 22-1178

- Delek US Holdings, Inc.; Lion Oil Company, LLC; Alon Refining Krotz Springs, Inc.; and Delek Refining, Ltd., No. 22-1181

- Sinclair Wyoming Refining Company LLC; and Sinclair Casper Refining Company LLC, No. 22-1183

- CHS, Inc., No. 22-1185

- HF Sinclair Refining & Marketing LLC; HF Sinclair Cheyenne Refining LLC; HF Sinclair Woods Cross Refining, LLC, No. 22-11865

- Kern Oil & Refining Co., No. 22-1187

- Cross Oil Refining & Marketing, Inc., No. 22-1188

- United Refining Company, No. 22-1189

- American Refining Group, Inc., Nos. 22-1190 and 22-1246

- Calumet Montana Refining, LLC, and Calumet Shreveport Refining, LLC, No. 22-1191

- Countrymark Refining and Logistics, LLC, Nos. 22-1192 and 22-1238

- Ergon Refining, Inc., and Ergon-West Virginia, Inc., No. 22-1193

- Hunt Refining Company, No. 22-1194

- Par Hawaii Refining, LLC; U.S. Oil & Refining Company; and Wyoming Refining Company, Nos. 22-1195 and 22-1240

- Placid Refining Company LLC, No. 22-1196

- San Joaquin Refining Co., Inc., No. 22-1197

- The San Antonio Refinery LLC, No. 22-1198

**Respondents:**
- United States Environmental Protection Agency

**Intervenors for Respondent:**

- American Coalition for Ethanol

- Growth Energy

- National Corn Growers Association

- National Farmers Union

- Renewable Fuels Association

**Amici:**

- None

II.    **Rulings Under Review**

1.    The final action of the Administrator of EPA issued on April 7, 2022 and titled "April 2022 Denial of Petitions for RFS Small Refinery Exemptions." This agency action denied Petitioners' petitions for small-refinery hardship exemptions from the Renewable Fuel Standard for the 2018 compliance year. Notice of this final agency action was published in the Federal Register on April 25, 2022. 87 Fed. Reg. 24,300.

2.    The final action of the Administrator of EPA issued on June 3, 2022 and titled "June 2022 Denial of Petitions for RFS Small Refinery Exemptions." This agency action denied Petitioners' petitions for small-refinery hardship exemptions from the Renewable Fuel Standard for the 2016, 2017, 2019, 2020, and/or 2021 compliance years. Notice of this final agency action was published in the Federal Register on June 8, 2022. 87 Fed. Reg. 34,873.

III.    **Related Cases**

Each of the Petitions for Review consolidated with No. 22-1073 is related. The consolidated cases have not been reviewed by this or any other Court.

Petitioners American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Ergon Refining, Inc., Ergon-West Virginia, Inc., Countrymark Refining and Logistics, LLC, Hunt Refining Company, Kern Oil & Refining Co., Par Hawaii Refining, LLC, U.S. Oil & Refining Company, Wyoming Refining Company, Placid

Refining Company LLC, San Joaquin Refining Co., Inc., and The San Antonio Refinery LLC also filed petitions for review of the same agency actions in the regional circuits in which these Petitioners' refineries are located, because they believe that venue is proper there pursuant to 42 U.S.C. § 7607(b)(1). These Petitioners filed petitions in this Court as a protective measure because EPA stated in the agency actions that "any petitions for review of this final action must be filed in the Court of Appeals for the District of Columbia Circuit." EPA moved to dismiss or transfer to the D.C. Circuit all these Petitioners' regional circuit actions, some of which were either dismissed or transferred to the D.C. Circuit and consolidated in this action. Accordingly, the following cases remain pending in regional circuits that involve challenges to the same EPA final agency actions:

- *Calumet Shreveport Refining, LLC, v. EPA*, Nos. 22-60266, 22-60425, 22-60433, 22-60434 (5th Cir.); and

- *Hunt Refining Company v. EPA*, Nos. 22-11617, 12535 (11th Cir.).

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure and Circuit Rule 26.1, Petitioners provide the following disclosures:

**Alon Refining Krotz Springs, Inc.** is a direct or indirect wholly owned subsidiary of Delek US Holdings, Inc. Alon Refining Krotz Springs, Inc. is a corporation formed under the laws of the State of Delaware.

**American Refining Group, Inc.** is a Pennsylvania corporation. It is a refiner of petroleum products, has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Calumet Montana Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products and a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

**Calumet Shreveport Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products and a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet

Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

**Cenovus Energy Inc.** has no parent companies. CK Hutchison Holdings Limited, which is publicly traded on the Hong Kong Stock Exchange, owns more than 10% of Cenovus Energy.

**CHS Inc.** is a privately held cooperative formed under the laws of the State of Minnesota with some publicly traded preferred stock. CHS Inc. has no parent companies and no publicly held corporation owns 10% or more of its stock.

**Countrymark Refining and Logistics, LLC (CountryMark)** is cooperative business, owned and controlled by CountryMark member cooperatives, and each member cooperative, in turn, is owned and controlled by farmers, or local agricultural producers. CountryMark is a refiner of petroleum products. No publicly held company has a 10 percent or greater ownership interest in it.

**Cross Oil Refining & Marketing, Inc. (Cross Refining)** is a Delaware corporation. It is engaged in the business of refining and marketing petroleum products. Cross Refining is wholly owned by Martin Resource Management Corporation, which is privately held. There are no publicly traded entities that own 10% or more of Cross Refining's stock.

**Delek Refining, Ltd.** is a direct or indirect wholly owned subsidiary of Delek US Holdings, Inc. Delek Refining, Ltd. is a limited partnership formed under the laws of the State of Texas.

**Delek US Holdings, Inc.** is a publicly traded company formed under the laws of the State of Delaware. No publicly held company has a 10% or greater ownership interest in Delek US Holdings.

**Ergon Refining, Inc.** (ERI) is a Mississippi corporation. It is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**Ergon-West Virginia, Inc.** (EWVI) is a Mississippi corporation. EWVI. is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**HF Sinclair Cheyenne Refining LLC** (formerly known as HollyFrontier Cheyenne Refining LLC) is a Delaware limited liability company. It is wholly owned by HollyFrontier Corporation, which is a wholly-owned subsidiary of HF Sinclair Corporation, a publicly traded company on the NYSE under the symbol "DINO." No other publicly held company has a 10% or greater ownership interest in HF Sinclair Cheyenne Refining LLC.

**HF Sinclair Refining & Marketing LLC** (formerly known as HollyFrontier Refining & Marketing LLC) is a Delaware limited liability company. It is wholly owned by HollyFrontier Corporation, which is a wholly-owned subsidiary of HF Sinclair Corporation, a publicly traded company on the NYSE under the symbol "DINO." No other publicly held

company has a 10% or greater ownership interest in HF Sinclair Refining & Marketing LLC .

**HF Sinclair Woods Cross Refining LLC** (formerly known as HollyFrontier Woods Cross Refining LLC) is a Delaware limited liability company. It is wholly owned by HollyFrontier Corporation, which is a wholly-owned subsidiary of HF Sinclair Corporation, a publicly traded company on the NYSE under the symbol "DINO." No other publicly held company has a 10% or greater ownership interest in HF Sinclair Woods Cross Refining LLC.

**Hunt Refining Company** is a Delaware corporation. It is a refiner of petroleum products, an indirect wholly owned subsidiary of Hunt Consolidated, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**Kern Oil & Refining Co**., is a wholly-owned subsidiary of Casey Co., a privately-held California corporation. Neither Kern Oil & Refining Co. nor Casey Co. has any ownership relationship with a publicly held company.

**Lion Oil Company, LLC**, is a direct or indirect wholly owned subsidiary of Delek US Holdings, Inc. Lion Oil Company, LLC is a limited liability corporation formed under the laws of the State of Arkansas.

**Par Hawaii Refining, LLC** is a Delaware limited liability company. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly traded

corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

**Placid Refining Company LLC** is a Delaware limited liability company. It is a refiner of petroleum products, is owned 100% by its parent companies Placid Holding Company and RR Refining, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**San Joaquin Refining Co., Inc.** is a privately held company located in California. San Joaquin Refining Co., Inc. has no parent company, is not publicly traded, and no publicly held company has a 10 percent or greater ownership interest in it.

**Sinclair Casper Refining Company LLC** is currently a wholly-owned subsidiary of Sinclair Oil LLC, which is a wholly owned subsidiary of HF Sinclair Corporation, a publicly held company. No other publicly held company has a 10% or greater ownership interest in Sinclair Casper Refining Company LLC. From 2018 through 2020 (the years at issue in the challenged agency action and for which relief is sought), Sinclair Oil LLC was then known as Sinclair Oil Corporation and was a wholly owned subsidiary of REH Company (which was then known as The Sinclair Companies). REH Company is a privately held corporation with no parent corporation.

**Superior Refining Company LLC** is a direct or indirect subsidiary of Husky Superior Holding Corp., Husky Energy U.S., Holdings LLC, Cenovus US Enterprise Holdings Inc., Cenovus Overseas Finance ULC, Cenovus American Enterprises Ltd., and Cenovus Energy Inc.

**Sinclair Wyoming Refining Company LLC** is currently a wholly-owned subsidiary of Sinclair Oil LLC, which is a wholly owned subsidiary of HF Sinclair Corporation, a publicly held company. No other publicly held company has a 10% or greater ownership interest in Sinclair Wyoming Refining Company LLC. From 2018 through 2020 (the years at issue in the challenged agency action and for which relief is sought), Sinclair Oil LLC was then known as Sinclair Oil Corporation and was a wholly owned subsidiary of REH Company (which was then known as The Sinclair Companies). REH Company is a privately held corporation with no parent corporation.

**The San Antonio Refinery LLC** (TSAR) is a Delaware limited liability company (f/k/a Calumet San Antonio Refining, LLC). TSAR is a refiner of petroleum products. TSAR is owned 100 percent by Allegiance Refining, LLC. Allegiance Refining, LLC, is a Texas limited liability company. It is a refining operations company and operator of Petitioner TSAR. Allegiance Refining, LLC, is not publicly traded, and no publicly held company has a ten percent or greater ownership interest in it.

**United Refining Company** is a Pennsylvania corporation. United Refining Company is engaged in the business of refining and marketing

petroleum products. United Refining's parent companies are as follows: United Refining, Inc; United Acquisition Corp.; and Red Apple Group, Inc. There are no publicly traded entities that own 10% or more of United Refining's stock.

**U.S. Oil & Refining Co.** is a Delaware corporation. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

**Wynnewood Refining Company, LLC**, is a wholly owned subsidiary of CVR Refining, LLC, a Delaware limited liability company. CVR Refining, LLC is a wholly owned subsidiary of CVR Refining, LP, which is an indirect wholly owned subsidiary of CVR Energy, Inc., a Delaware corporation that is publicly traded on the NYSE under the symbol "CVI." Icahn Enterprises, L.P. and its affiliates ("IEP") hold a ten percent or greater ownership interest in CVR Energy Inc. IEP is a publicly traded partnership under the symbol "IEP."

**Wyoming Refining Company** is a trade name for Hermes Consolidated, LLC, a Delaware limited liability company. Wyoming Refining Company is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held

corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request oral argument. This case presents novel and complex issues regarding EPA's denial of small-refinery hardship petitions under the Clean Air Act ("Act"). Petitioners contend, in particular, that EPA's final agency actions were arbitrary, capricious, and contrary to law because EPA: violated the textual requirements of the Act; relied on a new economic theory that was empirically and demonstrably false; applied an impermissibly retroactive standard; and defined "small refinery" status in contravention of the statute.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ............................................. i

CORPORATE DISCLOSURE STATEMENT ........................................... vi

STATEMENT REGARDING ORAL ARGUMENT .............................. xiv

TABLE OF CONTENTS ...................................................... xv

TABLE OF AUTHORITIES ................................................... xix

GLOSSARY ................................................................ xxx

STATEMENT OF JURISDICTION ............................................. 1

STATEMENT OF ISSUES ..................................................... 2

STATUTES AND REGULATIONS .............................................. 3

STATEMENT OF THE CASE ................................................. 3

I.    Introduction ...................................................... 3

II.   Background ........................................................ 8

      A.   The RFS Program and small refinery relief ........................... 8

      B.   EPA's mismanagement of the RFS program ........................ 13

      C.   Petitioners' refineries and their history of hardship relief ...................................................... 15

      D.   Prior related litigation ........................................... 17

      E.   The April and June Denials ....................................... 19

      F.   Skyrocketing RIN costs caused by EPA's actions ................ 22

      G.   GAO's report on EPA's Denials ................................... 24

# TABLE OF CONTENTS
## (CONTINUED)

**Page**

H.    EPA's December 2022 RIN price analysis ........................... 25

I.    Procedural history ................................................ 26

SUMMARY OF ARGUMENT ........................................ 28

STANDING ............................................................ 32

STANDARD OF REVIEW ............................................ 33

ARGUMENT ........................................................... 34

I.   EPA's new interpretations of the Clean Air Act are contrary to law. ..................................................... 34

     A.    Congress requires a holistic analysis of a small refinery's ability to comply with the RFS. ........................... 34

     B.    EPA effectively eliminated the statutory hardship exemption for small refineries. ............................... 36

     C.    EPA unlawfully redefined "disproportionate economic hardship." .............................................. 39

     D.    EPA unlawfully limited the factors to be considered in determining whether a small refinery is subject to disproportionate economic hardship. ................................................ 42

     E.    EPA failed to consider each refinery petition individually, as the statute requires. ................................ 56

     F.    EPA's interpretations of the hardship exemption are not entitled to any deference. ........................ 59

## TABLE OF CONTENTS
## (CONTINUED)

Page

II.   EPA's Denials are arbitrary and capricious. ...............................62

    A.   EPA failed to justify a central assumption of its
         economic theory....................................................................63

    B.   EPA failed to support its RIN cost passthrough
         theory....................................................................................66

    C.   EPA failed to support its RIN discount theory....................70

    D.   EPA's RIN passthrough theory incorrectly—and
         unreasonably—assumes that refineries purchase
         all RINs ratably....................................................................71

    E.   EPA's result was impermissibly preordained. ....................76

    F.   EPA's denials were counter to the evidence before
         the agency.............................................................................80

III.   EPA unlawfully applied its new standard retroactively. ..............87

    A.   The April and June Denials are unlawfully
         retroactive. ..........................................................................87

    B.   EPA did not ameliorate the harm that it caused
         by missing statutory deadlines. ..........................................91

IV.   EPA lacks authority to deny "small refinery" status to
    certain Petitioners contrary to the statutory definition...............93

    A.   ▮▮▮▮▮▮▮▮ qualifies as a "small refinery."....................94

    B.   ▮▮▮▮▮▮▮▮▮▮ refinery is eligible for
         hardship relief. ....................................................................98

CONCLUSION .................................................................................103

## TABLE OF CONTENTS
## (CONTINUED)

**Page**

APPENDIX A ...........................................................................106

CERTIFICATE OF COMPLIANCE......................................................112

CERTIFICATE OF SERVICE...............................................................113

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

PAGE(S)

<small>CASES</small>

*Am. Hosp. Ass'n v. Becerra,*
    142 S. Ct. 1896 (2022) ........................................................................ 59

*American Fuel & Petrochemical Mfrs. v. EPA,*
    937 F.3d 559 (D.C. Cir. 2019) ........................................................... 63

*American Methyl Corp. v. EPA,*
    749 F.2d 826 (D.C. Cir. 1984) ........................................................... 91

*American Petroleum Inst. v. EPA,*
    862 F.3d 50 (D.C. Cir. 2017) ............................................................. 71

*Americans for Clean Energy v. EPA,*
    864 F.3d 691 (D.C. Cir. 2017) ..................................................... 48, 92

*Associated Gen. Contractors of California, Inc. v. California State
    Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................... 51

*Baldwin v. United States,*
    140 S. Ct. 690 (2020) (Thomas, J., dissenting from denial of
    certiorari) .......................................................................................... 61

*BellSouth Telecomms., Inc. v. FCC,*
    469 F.3d 1052 (D.C. Cir. 2006) ......................................................... 64

*BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency of U.S.,*
    467 F.3d 871 (5th Cir. 2006) ............................................................. 77

*Blue Water Navy Vietnam Veterans Ass'n v. McDonald,*
    830 F.3d 570 (D.C. Cir. 2016) ........................................................... 44

*BP P.L.C. v. Mayor & City Council of Baltimore,*
    141 S. Ct. 1532 (2021) ................................................................. 35, 48

*Buffington v. McDonough,*
    143 S. Ct. 14 (2022) (Gorsuch, J., dissenting) .................................. 61

## TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

*Burrage v. United States,*
    571 U.S. 204 (2014) .................................................................. 50

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
    631 F.3d 1072 (9th Cir. 2011) ..................................... 78, 79

*Cassell v. FCC,*
    154 F.3d 478 (D.C. Cir. 1998) ........................................... 89

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ..................................... 29, 59, 60, 61

*City Ctr. W., LP v. Am. Mod. Home Ins. Co.,*
    749 F.3d 912 (10th Cir. 2014) .......................................... 77

*City of Arlington, Tex. v. FCC,*
    569 U.S. 290 (2013) (Roberts, C.J., dissenting) .............. 100

*Clark-Cowlitz Joint Operating Agency v. FERC,*
    800 F.2d 1074 (D.C. Cir. 1987) ........................................ 88

*Cnty. of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ........................................ 64

*Dalton Trucking, Inc. v. EPA,*
    808 F.3d 875 (D.C. Cir. 2015) ............................................ 1

*DeNaples v. Officer of Comptroller of Currency,*
    706 F.3d 481 (D.C. Cir. 2013) .......................................... 60

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ...................................................... 76

*DHS v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020) ...................................................... 88

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015) ............................................ 64

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE(S)**

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003)...............................................................42

*El Paso Nat. Gas Co. v. United States,*
    750 F.3d 863 (D.C. Cir. 2014) .........................................42

*EPA v. EME Homer City Generation, L.P.,*
    572 U.S. 489 (2014)...............................................................97

*Ergon-West Virginia, Inc. v. EPA,*
    896 F.3d 600 (4th Cir. 2018).......................................57, 58

*Falcon v. Gen. Tel. Co.,*
    815 F.2d 317 (5th Cir. 1987)..........................................77

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)....................................................33, 86

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)...............................................................87

*Fed. Power Comm'n v. Conway Corp.,*
    426 U.S. 271 (1976)...............................................................43

*Fund for Animals, Inc. v. Kempthorne,*
    472 F.3d 872 (D.C. Cir. 2006) .........................36, 37, 38

*Genuine Parts Co. v. EPA,*
    890 F.3d 304 (D.C. Cir. 2018) .........................................63

*Hermes Consol., LLC v. EPA,*
    787 F.3d 568 (D.C. Cir. 2015) .........................40, 43, 61

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
    141 S. Ct. 2172 (2021)......................3, 5, 11, 18, 34, 35, 38, 39, 47, 48

*Holmes v. Sec. Investor Prot. Corp.,*
    503 U.S. 258 (1992)...............................................................51

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGE(S)**

*Howmet Corp. v. EPA,*
   614 F.3d 544 (D.C. Cir. 2010) ........................................................... 87

*Husted v. A. Philip Randolph Inst.,*
   138 S. Ct. 1833 (2018) ....................................................................... 46

*INS v. St. Cyr,*
   533 U.S. 289 (2001) ........................................................................... 97

*Kern Oil & Refining Co. v. EPA,*
   No. 21-71246, 2022 WL 3369528 (9th Cir. Aug. 16, 2022) ............... 74

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ....................................................................... 95

*Kristin Brooks Hope Ctr. v. FCC,*
   626 F.3d 586 (D.C. Cir. 2010) ..................................................... 69, 70

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ........................................................................... 52

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ................................................................. 43, 46

*Lomax v. Ortiz-Marquez,*
   140 S. Ct. 1721 (2020) ....................................................................... 45

*Loper Bright Enters. v. Raimondo,*
   No. 22-451 (U.S. Nov. 10, 2022) (cert. granted) ............................... 61

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................... 33

*Luna Perez v. Sturgis Pub. Sch.,*
   143 S. Ct. 859 (2023) ......................................................................... 55

*McDonald v. Watt,*
   653 F.2d 1035 (5th Cir. 1981) ........................................................... 90

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE(S)**

*Medina Tovar v. Zuchowski,*
    982 F.3d 631 (9th Cir. 2020) (en banc) ............................................ 100

*Michigan v. EPA,*
    576 U.S. 743 (2015) ...................................................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................... 33, 64, 71, 72

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,*
    472 U.S. 237 (1985) ...................................................................... 36

*Murray Energy Corp. v. EPA,*
    936 F.3d 597 (D.C. Cir. 2019) ........................................................ 34

*Music Choice v. Copyright Royalty Bd.,*
    970 F.3d 418 (D.C. Cir. 2020) ........................................................ 63

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) ...................................................... 97

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ...................................................... 100

*Nat. Res. Def. Council v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) ...................................................... 43

*NLRB v. Wyman-Gordon Co.,*
    394 U.S. 759 (1969) ...................................................................... 90

*Paroline v. United States,*
    572 U.S. 434 (2014) ...................................................................... 51

*Phillips Petroleum Co. v. FERC,*
    792 F.2d 1165 (D.C. Cir. 1986) ...................................................... 77

*Proffitt v. FDIC,*
    200 F.3d 855 (D.C. Cir. 2000) ...................................................... 59

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGE(S)**

*PRUITT v. EPA*,
   No. 18-1202, Doc. 1780504 (D.C. Cir. Apr. 1, 2019) ............................ 2

*Renewable Fuels Ass'n v. EPA*,
   854 F. App'x 983 (10th Cir. 2021) (per curiam) ................................ 76

*Renewable Fuels Ass'n v. EPA*,
   948 F.3d 1206 (10th Cir. 2020), *vacated* No. 18-9533, 2021 WL
   8269239 (10th Cir. July 27, 2021) ................................... 18, 31, 76, 77

*Renewable Fuels Ass'n v. EPA*,
   No. 21-9518 (10th Cir. filed Feb. 8, 2021) ......................................... 18

*Retail, Wholesale & Dep't Store Union, AFL-CIO v. NLRB*,
   466 F.2d 380 (D.C. Cir. 1972) ............................................................ 90

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ............................................................................. 90

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ...................................................... 32, 33

*Sinclair Wyoming Refining Co. v. EPA*,
   887 F.3d 986 (10th Cir. 2017) ........ 34, 35, 36, 42, 45, 57, 58, 60, 61, 62

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................. 62

*Sorenson Commc'ns, Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ...................................................... 68, 74

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ............................................................................. 46

*State of Texas v. EPA*,
   No. 23-60069, Doc. 269-1 (5th Cir. May 1, 2023) ................................ 1

## TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2016)...................................................................52

*Stinson v. United States*,
    508 U.S. 36 (1993)...................................................................95

*Suncor Energy (U.S.A.), Inc. v. EPA*,
    50 F.4th 1339 (10th Cir. 2022) .........................................80

*Teva Pharm. U.S.A. Inc. v. FDA*,
    441 F.3d 1 (D.C. Cir. 2006) ...............................................77

*U.S. Dep't of Veterans Affs. v. Fed. Lab. Rels. Auth.*,
    9 F.3d 123 (D.C. Cir. 1993) ...............................................37

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)............................................. 60, 61, 100

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014).................................. 34, 39, 59, 101

*Western Coal Traffic League v. Surface Transp. Bd.*,
    998 F.3d 945 (D.C. Cir. 2021) ..........................................61

*Wilder v. Virginia Hosp. Ass'n*,
    496 U.S. 498 (1990)............................................................39

*Williams Nat. Gas Co. v. FERC*,
    3 F.3d 1544 (D.C. Cir. 1993) ............................................88

*Ysleta del Sur Pueblo v. Texas*,
    142 S. Ct. 1929 (2022)............................................. 36, 41

**STATUTES**

5 U.S.C. § 706(2).............................................................................33

16 U.S.C. § 808(d)(1) ....................................................................43

**TABLE OF AUTHORITIES
(CONTINUED)**

**PAGE(S)**

16 U.S.C. § 1539(b)(1)-(2) ........................................................................ 42

21 U.S.C. § 360eee-1 .......................................................................... 41, 42

21 U.S.C. § 364b(b) ..................................................................................... 42

21 U.S.C. § 2223(d)(1) ........................................................................ 41, 42

42 U.S.C. § 300gg-111(c)(5)(D) ............................................................... 43

42 U.S.C. § 4905(c)(1) ................................................................................ 41

42 U.S.C. § 4916(a)(1) ................................................................................ 41

42 U.S.C. § 4917(a)(1) ................................................................................ 41

42 U.S.C. § 7407(e)(3) ................................................................................ 45

42 U.S.C. § 7410(f)(5) .......................................................................... 45, 46

42 U.S.C. § 7412(b) ..................................................................................... 45

42 U.S.C. § 7419(b)(3) ................................................................................ 41

42 U.S.C. § 7420(a)(2)(B) ........................................................................... 45

42 U.S.C. § 7491(g)(1) ................................................................................ 41

42 U.S.C. § 7511b(f)(1)(B) ......................................................................... 41

42 U.S.C. § 7521(a)(2) ................................................................................ 41

42 U.S.C. § 7545(o) ....................................................................................... 8

42 U.S.C. § 7545(o)(1)(K)........................................................ 11, 94, 99, 102

42 U.S.C. § 7545(o)(2)..................................................................... 8, 9, 89

42 U.S.C. § 7545(o)(3)..................................................................... 8, 9

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE(S)**

42 U.S.C. § 7545(o)(5) ................................................................. 10, 53

42 U.S.C. § 7545(o)(9)(A) ..............................................................
.................................... 4, 11, 12, 35, 41, 44, 47, 57, 60, 79, 95, 99, 100

42 U.S.C. § 7545(o)(9)(B) ...............................................................
.................................. 4, 12, 35, 38, 39, 56, 57, 60, 78, 79, 88, 91, 95, 99

42 U.S.C. § 7545(t)(8) ................................................................. 45

42 U.S.C. § 7547(b) ................................................................... 41

42 U.S.C. § 7571(b) ................................................................... 41

42 U.S.C. § 7607(b) ................................................................. 1, 97

42 U.S.C. § 7617(c)(1) ................................................................ 41

49 U.S.C. § 30113(b)(3)(B)(i) ......................................................... 41

49 U.S.C. § 32902(h) .................................................................. 43

49 U.S.C. § 41734(h) .................................................................. 43

Pub. L. No. 109-58, 119 Stat. 594 (2005) ............................................. 8

Pub. L. No. 110-140, 121 Stat. 1492 (2007) .......................................... 8

**RULES**

D.C. Cir. R. 28 ....................................................................... 32

**REGULATIONS**

40 C.F.R. § 80.1101(g) ................................................................ 96

40 C.F.R. § 80.1141 ...................................................... 95, 96, 97, 102

40 C.F.R. § 80.1401 ................................................................... 96

## TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

40 C.F.R. § 80.1406 ................................................................. 9

40 C.F.R. § 80.1407 ................................................................. 9

40 C.F.R. § 80.1426 ................................................................. 9

40 C.F.R. § 80.1427 .............................................................. 9, 10

40 C.F.R. § 80.1428 ............................................................... 10

40 C.F.R. § 80.1429 ............................................................... 10

40 C.F.R. § 80.1441 ............................................... 96, 100, 102

40 C.F.R. § 80.1442(a) ........................................................ 102

72 Fed. Reg. 23,900 (May 1, 2007) ..................................... 10

75 Fed. Reg. 14,670 (Mar. 26, 2010) .................................. 10

84 Fed. Reg. 10,584 (Mar. 21, 2019) .................... 11, 52, 64, 72

84 Fed. Reg. 26,980 (June 10, 2019) .................................. 52

86 Fed. Reg. 17,073 (Apr. 1, 2021) .................................... 14

87 Fed. Reg. 24,300 (Apr. 25, 2022) .................................... 1

87 Fed. Reg. 34,873 (June 8, 2022) ...................................... 1

87 Fed. Reg. 35,711 (June 13, 2022) .................................. 15

87 Fed. Reg. 39,600 (July 1, 2022) ................................ 13, 14

87 Fed. Reg. 54,158 (Sept. 2, 2022) ................................... 93

87 Fed. Reg. 80,582 (Dec. 30, 2022) .................................. 13

87 Fed. Reg. 5696 (Feb. 2, 2022) ................................ 13, 14, 93

## TABLE OF AUTHORITIES
### (CONTINUED)

**PAGE(S)**

OTHER AUTHORITIES

161 Cong. Rec. H10105 (daily ed. Dec. 17, 2015) ................................... 83

Cost, *Oxford English Dictionary* (3d ed. 2015) ...................................... 40

Hardship, *Oxford English Dictionary* (3d ed. 2015) .............................. 35

Impose, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002) ............................................................................ 35

S. Rep. No. 108-57 (2003) (statement of Sen. Cornyn) .......................... 11

S. Rep. No. 111-45 (2009) ............................................................... 47, 83

# GLOSSARY

| | |
|---|---|
| April Denial | April 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| Act | Clean Air Act |
| DOE | U.S. Department of Energy |
| EPA | U.S. Environmental Protection Agency |
| EPA RIN Price Analysis | EPA, An Analysis of the Price of Renewable Identification Numbers (RINs) and Small Refineries, EPA-420-R-22-038 (Dec. 2022), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1016CAA.pdf |
| GAO Report | U.S. Government Accountability Office, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program, GAO23104273 (Nov. 2022), https://www.gao.gov/products/gao-23-104273 |
| June Denial | June 2022 Denial of Petitions for RFS Small Refinery Exemptions |
| Petitioners | Alon Refining Krotz Springs, Inc., American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Cenovus Energy Inc., CHS Inc., Countrymark Refining and Logistics, LLC, Cross Oil Refining & Marketing, LLC, Delek Refining, Ltd., Delek US Holdings, Inc., Ergon Refining, Inc., Ergon-West Virginia, Inc., HF Sinclair Cheyenne Refining LLC, HF Sinclair Refining & Marketing LLC, HF Sinclair Woods Cross Refining LLC, Hunt Refining Company, |

|  | Kern Oil & Refining Co., Lion Oil Company, LLC, Par Hawaii Refining, LLC, Placid Refining Company LLC, San Joaquin Refining Co., Inc., Sinclair Casper Refining Company LLC, Superior Refining Company LLC, Sinclair Wyoming Refining Company LLC, The San Antonio Refinery LLC, United Refining Company, U.S. Oil & Refining Company, Wynnewood Refining Company, LLC, and Wyoming Refining Company |
| --- | --- |
| Regional Circuit Petitioners | American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Countrymark Refining and Logistics, LLC, Ergon Refining, Inc., Ergon-West Virginia, Inc., Hunt Refining Company, Kern Oil & Refining Co., Par Hawaii Refining, LLC, Placid Refining Company LLC, San Joaquin Refining Co., Inc., The San Antonio Refinery LLC, U.S. Oil & Refining Co., Wyoming Refining Co., and Wynnewood Refining Company, LLC |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| 2011 DOE Study | DOE, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship (EPA-HQ-OAR-2021-0566-0002) |

## STATEMENT OF JURISDICTION

Respondent the U.S. Environmental Protection Agency ("EPA") published notice of the "April 2022 Denial of Petitions for RFS Small Refinery Exemptions" ("April Denial") on April 25, 2022, 87 Fed. Reg. 24,300 (JA2932). EPA published notice of the "June 2022 Denial of Petitions for RFS Small Refinery Exemptions" ("June Denial") on June 8, 2022, 87 Fed. Reg. 34,873 (JA3115).[1] Petitioners timely filed petitions for review within 60 days of the April and June Denials. 42 U.S.C. § 7607(b)(1).[2] JA3292-3397. This Court has jurisdiction under § 7607(b)(1).

Several Petitioners dispute that venue is proper in this Court and filed "protective" petitions for review here to "preserve their objection to venue." *Dalton Trucking, Inc. v. EPA,* 808 F.3d 875, 880 (D.C. Cir. 2015) ("Petitioners preserved their objection to venue in this circuit … by filing in both our circuit and the [regional circuit court]."). The Regional Circuit Petitioners contend that EPA's decisions on small-refinery hardship petitions are "locally or regionally applicable" and "may be filed only in the United States Court of Appeals for the appropriate circuit." § 7607(b)(1); *see also* Order 6-13, *State of Texas v. EPA*, No. 23-60069, Doc. 269-1 (5th Cir. May 1, 2023). EPA previously represented to this Court that a "decision with respect to a particular small refinery's request

---

[1] The April Denial is at Joint Appendix ("JA") 2942-3016, and the June Denial is at JA3119-3194. They are nearly identical.

[2] Unless otherwise noted, all statutory citations are to Title 42 of the United States Code.

for an exemption from statutory requirements adjudicates legal rights as to that single refinery in its single location and is a quintessentially local action," and "the regional circuits, not this Court" review "EPA actions on small refinery exemption requests." EPA Brief 15-16, *PRUITT v. EPA*, No. 18-1202, Doc. 1780504 (D.C. Cir. Apr. 1, 2019) (collecting cases).

## STATEMENT OF ISSUES

I.     Were the April and June Denials contrary to law where EPA effectively eliminated the statutory hardship exemption, misinterpreted multiple statutory terms, and failed to comply with the statute's mandate to holistically consider the individual circumstances of each petitioning small refinery?

II.     Were the Denials arbitrary, capricious, or otherwise contrary to law where EPA relied on a new economic theory that is demonstrably false and rests on unreasonable and unsupported assumptions; and where EPA began with a preordained result and ignored refinery-specific evidence showing that its theory did not apply to Petitioners?

III.     Were the Denials arbitrary, capricious, or otherwise contrary to law where EPA jettisoned its longstanding standards for adjudicating hardship petitions and retroactively applied new standards to past compliance years, and where EPA failed to mitigate the harm to Petitioners from EPA's disregard for statutory deadlines?

IV.   Were EPA's determinations that ████████████████

████████ refineries are ineligible for hardship relief contrary to the

statute and arbitrary and capricious?

## STATUTES AND REGULATIONS

The pertinent statutory provision is included in the accompanying

Addendum.

## STATEMENT OF THE CASE

## I.   Introduction

An administrative agency has no authority to nullify a form of

statutory protection that Congress expressly granted. But that is what

EPA has attempted to do here, by effectively eliminating the statutory

hardship exemption for small refineries that Congress built into the

Renewable Fuel Standard ("RFS") under the Clean Air Act ("Act").

The RFS requires that certain volumes of biofuels be blended every

year into the gasoline and diesel fuel that powers Americans' motor

vehicles. To implement the RFS, EPA obligated refineries (which process

crude oil into transportation fuel) to either blend increasing amounts of

ethanol and other biofuels into their products or else purchase credits

called renewable identification numbers ("RINs") from entities that blend

more than the required amounts. Congress recognized, however, that the

RFS "could work special burdens on small refineries," which are limited

in their ability to blend renewable fuels. *HollyFrontier Cheyenne Refin.,*

*LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021).

Congress accordingly provided a critical safety valve that allows a small refinery to petition for an exemption from annual RFS compliance based on "disproportionate economic hardship." § 7545(o)(9)(B)(i). Congress required EPA to decide each hardship petition on an individual, case-by-case basis in "consultation" with the U.S. Department of Energy ("DOE") and by "consider[ing] the findings" of a 2011 DOE study on small refineries' economic hardship. § 7545(o)(9)(A)(ii)(I), (B)(i)-(ii).[3] Congress also required EPA to decide hardship petitions within 90 days because exemption determinations are essential to small refineries' ability to manage their obligations. § 7545(o)(9)(B)(iii). But EPA has failed to follow that deadline for almost *90%* of hardship petitions since 2013, causing significant uncertainty and prejudice for petitioning refineries.

Hardship exemptions are a lifeline for Petitioners, which operate small refineries that provide good jobs for their communities. Petitioners lack the blending capabilities and inherent scale advantages of their larger, vertically integrated competitors, and Petitioners are further constrained from blending by their rural locations, which require them to ship most of their fuel on pipelines that prohibit blended fuels. All Petitioners have previously received hardship relief from EPA, and many have received exemptions every year or nearly every year since the RFS program's inception.

---

[3] DOE, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship ("2011 DOE Study") (JA3-102).

Petitioners' burdens from RFS compliance only grew more dispro-
portionate from 2016 to 2021—the years covered by the petitions at issue
here. DOE's 2011 study predicted that small refineries' hardship would
become more acute as annual blending requirements increased and
larger companies developed blending facilities to capture RINs that small
refineries could not. And that is just what has happened: many small
refineries have no choice but to buy RINs at the price that larger compa-
nies are willing to sell them, subjecting Petitioners to significant eco-
nomic hardship.

After the change in presidential administrations, however, EPA
came to disfavor the small-refinery hardship exemptions provided by
Congress and set about attempting to eliminate them. EPA first flipped
its legal position in *HollyFrontier* and asked the Supreme Court to sunset
the exemptions, but the Court rejected EPA's new legal argument. When
that strategy failed, EPA shifted course in 2022 to the April and June
Denials. Even though the relevant compliance years had long since ended
and EPA was years late in adjudicating Petitioners' hardship petitions,
EPA suddenly applied a new interpretation of multiple statutory
provisions that Petitioners could not have foreseen when they prepared
their petitions and developed their RFS compliance strategy for those
years. Based on this new interpretation, EPA denied more than a
hundred pending hardship petitions—including dozens that it had previ-

ously *granted*—and announced that it does not expect to ever again grant hardship relief to any small refinery.

EPA's decision is unlawful several times over. First, EPA's new interpretation is contrary to the Act's text. The statute requires EPA to conduct a holistic inquiry into each refinery's circumstances to determine whether RFS compliance would cause "disproportionate economic hardship." But EPA has replaced the congressionally mandated inquiry with an altogether different one that considers only a single factor: the cost of RINs bought ratably (*i.e.*, contemporaneously with the sale of fuel). And instead of evaluating each refinery individually, EPA applied a one-size-fits-all theory and ignored refinery-specific evidence.

Second, EPA's Denials were arbitrary and capricious. The Denials rest on a new "economic theory" that assumes RIN costs are equal for all parties, regardless of their size, (rural) location, or relative bargaining power. Based on that novel theory, EPA claims that small refineries supposedly fully recover the cost of purchasing RINs by passing their costs through to consumers. But EPA ignored its own data and Petitioners' overwhelming evidence that they *cannot* fully pass through their RIN costs, contrary to EPA's new economic theory. Indeed, the U.S. Government Accountability Office ("GAO") recently studied how EPA

evaluated the petitions at issue and identified numerous serious flaws.[4] GAO's conclusions were striking: EPA's Denials rely on a "flawed assumption and an incomplete assessment," such that EPA "ma[d]e decisions on small refinery exemptions without quality information and, therefore, risk[ed] inappropriately denying valid exemption petitions." JA3411, 3415, 3428.

Third, EPA unlawfully applied its new approach retroactively, after the compliance years were over and the petitions had been submitted in reliance on EPA's existing standard. EPA also failed to comply with its obligation to minimize the harm it caused by repeatedly missing statutory deadlines.

Fourth, EPA incorrectly determined that two small refineries were ineligible for hardship relief despite having granted both refineries relief in the past. EPA's disqualification of both refineries for 2018-2020 (and every year thereafter) was contrary to law and arbitrary and capricious.

In sum, the April and June Denials are not the work of an agency that sought to faithfully implement the statutory text governing the RFS program. The Denials instead reveal an agency that started with its preferred result—eliminating the small-refinery hardship exemption

---

[4] GAO, *Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program*, GAO-23104273 (Nov. 2022) ("GAO Report") (JA3398-3475).

that Congress established—and then mangled the statute and ignored the evidence it was required to consider.

This Court should vacate the Denials and remand to EPA with instructions to reinstate the previously granted 2016-2018 exemptions and to evaluate the 2019-2021 hardship petitions under the proper standard. Alternatively, if the Court upholds the Denials (or if EPA again denies the petitions on remand), the Court should order EPA to mitigate the harm to Petitioners that EPA caused by so severely violating the statutory decision deadlines.

## II. Background

### A. The RFS Program and small refinery relief

In 2005 and again in 2007, Congress amended the Act to include the present-day RFS program. *See* § 7545(o); Pub. L. No. 109-58, 119 Stat. 594 (2005); Pub. L. No. 110-140, 121 Stat. 1492 (2007). For each calendar year, a certain volume of four types of biofuel must be blended into transportation fuels (gasoline and diesel) sold in the United States. § 7545(o)(2)(B)(i)(I)-(IV). Congress directed EPA to promulgate regulations "to ensure that transportation fuel sold or introduced into commerce in the United States ... on an annual average basis, contains at least the applicable volume of renewable fuel." § 7545(o)(2)(A)(i).

#### 1. Renewable Volume Obligations

To implement the annual mandates, EPA sets a "renewable fuel obligation" for four biofuel categories that is a "volume percentage of [the]

transportation fuel" that DOE projects will be "sold or introduced into commerce in the United States" the following year. § 7545(o)(3)(A), (B)(ii). For example, if the projected amount of transportation fuel for next year were 100 billion gallons, and if the Act called for 10 billion gallons of renewable fuel, then EPA would set a volume percentage standard of 10% for that year. Congress gave EPA a deadline to set annual volumes, although EPA has failed repeatedly to meet it. *See* Statement II.B.

Congress provided that RFS obligations shall apply to "refineries, blenders, and importers, as appropriate." § 7545(o)(3)(B)(ii)(I); *see* § 7545(o)(2)(A)(iii)(I). "Refiners" produce petroleum-based fuels and other products from crude oil, whereas "blenders" mix renewable fuels into petroleum-based fuels to create the gasoline and diesel products sold at the pump. By regulation, EPA imposed the responsibility for meeting the renewable volume obligations only on refineries and importers. 40 C.F.R. § 80.1406. To calculate their individual renewable fuel obligations, those entities must multiply EPA's annual volume percentage by the volume of transportation fuel that they produce or import. *Id.* § 80.1407.

## 2.    Renewable Identification Numbers (RINs)

To meet their RFS obligations, refineries must secure blending credits called RINs. *Id.* § 80.1427. A RIN is created when a biofuel—*e.g.*, ethanol—is manufactured. *Id.* § 80.1426. The RIN remains attached to the physical volume of biofuel until it is blended into petroleum-based

transportation fuel, at which point the RIN is "separated." *Id.* §§ 80.1428, 80.1429. An obligated party may either generate its own RINs through blending or purchase RINs from other parties. § 7545(o)(5)(B).

EPA's choice to obligate refiners but not renewable fuel blenders has created haves and have-nots. Refiners that cannot self-generate enough RINs through blending are forced to buy RINs from others on an unregulated secondary market. RINs are traded on a spot market or bought and sold through private contracts. 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010). The RIN market is necessary because "[m]any obligated parties"—particularly small refineries—"do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." 72 Fed. Reg. 23,900, 23,904 (May 1, 2007). "RIN markets are highly volatile relative to related markets such as ethanol and other petroleum products." JA3450.

Refineries demonstrate compliance with the RFS by "retiring" RINs (*i.e.*, submitting them to EPA). RINs have a limited shelf life; they can be used for compliance only for the year in which they are generated or the next. § 7545(o)(5)(C). By regulation, EPA requires refineries to retire RINs for compliance anually. 40 C.F.R. § 80.1427(a). Neither the statute nor EPA has ever required refineries to acquire or retire RINs ratably. In fact, just four years ago, EPA rejected a proposal to require "real-time" RIN retirement, concluding that this would be "infeasible" and "counter-productive" because "[i]t would be virtually impossible for the market to

instantaneously meet such tight demand for RINs." 84 Fed. Reg. 10,584, 10,616 (Mar. 21, 2019).

### 3. Small-refinery hardship relief

"Congress was concerned" that RFS obligations "could work special burdens on small refineries that lack the inherent scale advantages of large refineries and sometimes supply a major source of jobs in rural communities." *HollyFrontier*, 141 S. Ct. at 2175 (cleaned up). That concern was well founded. "The number of small refineries has been in long-term decline," JA3409, in part due to "overburdening government regulations that make it too expensive for small refiners to stay in business," S. Rep. No. 108-57, at 42 (2003) (statement of Sen. Cornyn) (discussing predecessor to RFS).

So when Congress enacted the RFS, it sought to relieve the regulatory burdens on "small refineries"—that is, refineries "for which the average aggregate daily crude oil throughput for a calendar year … does not exceed 75,000 barrels," § 7545(o)(1)(K)—by creating a system for hardship relief in three phases. First, Congress gave small refineries a blanket exemption from the RFS until 2011. § 7545(o)(9)(A)(i). Second, Congress directed DOE to conduct a study to "determine whether compliance with the [RFS] would impose a disproportionate economic hardship on small refineries." § 7545(o)(9)(A)(ii)(I). If DOE found that a refinery would "be subject to a disproportionate economic hardship if required to comply" with the RFS, Congress instructed EPA to extend the refin-

ery's exemption at least two more years. § 7545(o)(9)(A)(ii)(II). Third, Congress authorized small refineries to petition "at any time … for an extension of the exemption … for the reason of disproportionate economic hardship." § 7545(o)(9)(B)(i). EPA must decide each petition "not later than 90 days after" receipt. § 7545(o)(9)(B)(iii).

To evaluate hardship petitions, EPA must, in "consultation" with DOE, "consider the findings" of the congressionally mandated DOE study on "whether compliance … would impose a disproportionate economic hardship on small refineries." § 7545(o)(9)(A)(ii)(I), (B)(ii). In that 2011 study, DOE found that small refineries "have particular obstacles that would make compliance more costly" than for large, integrated refineries; developed a scoring matrix "to evaluate the full impact of disproportionate economic hardship"; and concluded that many small refineries should be exempt. JA15, 44, 49. The scoring matrix considered a wide variety of economic factors, including a firm's relative margins, the degree to which a refiner can blend renewable fuels, whether RINs are a net source of revenue, whether events have had a temporary negative impact on the ability of the refinery to comply, and whether compliance costs would impair future efficiency improvements or lead to shutdown of the refinery. *See* JA45-48.

For more than a decade after the 2011 DOE Study—until the April and June Denials—EPA consistently "relied on DOE's findings" of disproportionate economic hardship and evaluated petitions for hardship

relief by applying DOE's "scoring matrix." JA3145. EPA nearly always granted hardship relief when DOE's scoring matrix recommended it. JA1017-1018. After EPA adopted its new statutory interpretation and economic theory at issue here, however, EPA denied hardship relief even when DOE's scoring matrix recommended an exemption based on a refinery-specific, individualized assessment. *See, e.g.*, ███████████ (DOE's scoring matrices for ██████ recommending exemptions for 2019 and 2020).

## B.    EPA's mismanagement of the RFS program

The Act has important deadlines that are necessary to make the RFS program function properly. Obligated parties need to know from EPA whether and how many RINs they are required to generate each year. But EPA has repeatedly violated those mandatory deadlines. Two types of deadlines are particularly relevant here: First, EPA has repeatedly been late in setting annual volume obligations and is now years behind. *See, e.g.*, 87 Fed. Reg. 5696 (Feb. 2, 2022) (extending compliance deadlines for 2020-2022 compliance years due to missed deadlines); 87 Fed. Reg. 80,582, 80,590 (Dec. 30, 2022) (conceding lateness in setting 2023 and 2024 volumes). For example, EPA did not finalize obligated parties' renewable fuel volume obligations for the 2021 compliance year until July 1, 2022—after the year was over and, therefore, after all the blending in 2021 had already occurred. *See* 87 Fed. Reg. 39,600, 39,601 (July 1, 2022). Second, EPA has failed to comply with

the statutory 90-day decision deadline for *almost 90%* of small-refinery hardship petitions since 2013. JA3422.

Those missed deadlines resulted in EPA choosing to split the 2019 compliance deadline. Obligated parties other than small refineries were required to retire their RINs on March 31, 2020—the original compliance deadline for 2019. 86 Fed. Reg. 17,073, 17,075 (Apr. 1, 2021). That decision drastically reduced supply in the RIN market, while small refineries were left in limbo for more than two years until their hardship petitions were finally decided in June 2022. *See* 87 Fed. Reg. at 5700.

EPA's regulatory failures have been calamitous for many small refineries. Due to EPA's missed deadlines, there was no responsible way for small refineries to plan for compliance, as GAO has explained. JA3422-3427. Petitioners did not know the final volumes that would apply for 2021 and 2022 until July 1, 2022. *See* 87 Fed. Reg. at 39,601. And they did not know whether they would have any obligation at all for 2019-2021 until EPA finally adjudicated their long-pending hardship petitions in June 2022—years after the statutory deadlines.

As GAO has further explained, because EPA's actions "substantially" affect the price of RINs, its delays have exposed small refineries to huge risks no matter whether they attempted to purchase RINs or waited for EPA to decide their hardship petitions. JA3426 (explaining how small refineries "lose out" whether they purchase RINs throughout the compliance year or not). For example, one small refinery that purchased RINs

during the compliance year lost $16 million dollars when EPA belatedly granted its petition just 10 business days before its RINs would expire. JA3426. The situation is no better for a small refinery that waits until after EPA's hardship decision to purchase RINs: it may have to buy RINs at much higher prices. JA3426. As GAO concluded, the "timing of EPA actions is associated with volatility in the RIN market, which adds to market uncertainty experienced by refineries." JA3426.

Due to EPA's regulatory failures, the RIN market is now cornered. As EPA acknowledges, just 11 obligated parties hold 75% "of all available 2020 and 2021 RINs." 87 Fed. Reg. 35,711, 35,714 n.23 (June 13, 2022). Predictably, RIN prices have soared to historic highs. EPA admits this reality, predicting that the few parties holding RINs will "choose to sell their RINs only at very high costs or in the alternative choose to not sell their RINs" at all. JA3283.

## C. Petitioners' refineries and their history of hardship relief

Small refineries are critical to the economic vitality of their small, often disadvantaged communities. Petitioners' refineries employ thousands of people, pay high salaries and wages, and support local charitable organizations. *See, e.g.*, JA16270 ¶ 30; JA16333 ¶¶ 28-29; JA16712-16713 ¶¶ 21-24; JA16004-16005 ¶¶ 23-26; JA15673 ¶¶ 28, 29.

Petitioners have applied for hardship exemptions because compliance with the RFS would impose disproportionate economic hardship,

and many have consistently received annual hardship relief. *See, e.g.,* JA10971; JA16261 ¶ 3; JA16322 ¶ 4; JA15997-15998 ¶¶ 2, 4; JA10245; JA15661 ¶ 4. Petitioners face disproportionate harm from the RFS for multiple reasons, three of which are highlighted here.

First, small refineries produce a significantly higher percentage of diesel fuel than gasoline compared to industry averages. It is harder to blend renewable fuel into diesel, which is typically blended with 5% or less renewable fuel whereas gasoline is typically blended with 10% ethanol. Several Petitioners produce *only* diesel, *see, e.g.,* ████████ ████████████████████████████, while others produce approximately double the national average, ████████████████████████████ ████████████████.

Second, many Petitioners are very small players in rural locations that must ship most of their fuel through pipelines that prohibit blended fuels, and they lack the economies of scale to compete with massive integrated refiners. ████████████████████████████████████. ████████████████, for example, must sell ████ of its transportation fuel into larger markets through pipeline systems that prohibit blended fuel. ████████████. Small refineries thus have no control over the blending of most of their fuel, which instead is blended downstream by non-obligated blenders and large integrated refineries that can separate and sell RINs for profit. ████████████. As a result, Petitioners are hostage to

the RIN market (and its high prices) and have no means to comply other than buying significant quantities of RINs.

Third, many Petitioners' local markets reject blended fuel altogether. For example, ██████████████████████████████ ██████ customers overwhelmingly prefer unblended diesel to biodiesel, either because biodiesel is unfamiliar or because it performs less well in cold weather. ████████████████████████████████████.

EPA previously relied on those factors (and others) to grant hardship relief to Petitioners, and those factors have remained materially unchanged for the compliance years at issue. Unsurprisingly, then, DOE concluded that most Petitioners again would suffer disproportionate economic hardship and recommended relief. *See, e.g.,* ████████████ ████████████████████████████████████████████ ████████████████. DOE observed, for example, that requiring ██████ to comply with the RFS in 2020 would "likely lead to shutdown." ██████. And DOE concluded that ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████.

## D.   Prior related litigation

This case involves EPA's denial of 105 petitions from 36 small refineries seeking hardship exemptions for the compliance years 2016-2021. Among the denied petitions are 35 petitions that EPA had previously granted—grants that were then challenged by parties representing

the interests of biofuel producers in coordinated cases before this Court and in *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206 (10th Cir. 2020) ("*RFA*"), *vacated* No. 18-9533, 2021 WL 8269239 (10th Cir. July 27, 2021). *See also Renewable Fuels Ass'n v. EPA*, No. 21-9518 (10th Cir. filed Feb. 8, 2021).

In *RFA*, the Tenth Circuit held that EPA had erred in granting three hardship petitions because (1) the petitioners had not received continuous exemptions since the beginning of the program and thus were purportedly ineligible for an "extension" of the exemption, *id.* at 1244-49; (2) in granting the petitions, EPA had considered "hardships beyond those caused by RFS compliance," *id.* at 1253-54; and (3) EPA had not adequately considered whether the petitioners could recoup their RFS compliance costs by passing them on to customers, *id.* at 1255-57.

In *HollyFrontier*, the Supreme Court granted review on the first issue. After a change in presidential administration, EPA flipped its position before the Supreme Court, arguing that any small refinery that ever does well enough in a given year not to need an exemption can never again receive relief. The Supreme Court rejected EPA's new argument as contrary to the Act's plain meaning. 141 S. Ct. at 2181 ("[T]he key phrase … means exactly what it says: A small refinery can apply for (if not always receive) a hardship extension 'at any time.'").

Six months after *HollyFrontier*, in December 2021, EPA issued a proposal to deny all pending hardship petitions based on a new statutory

interpretation and economic theory that "propos[ed] to find that no small refinery experiences [disproportionate economic hardship] due to their compliance with the RFS program." JA243. The next day, this Court granted EPA's motion for a voluntary remand of the petitions pending before this Court.

### E.    The April and June Denials

The actions challenged here were issued in April and June 2022. In the April Denial, EPA denied 36 petitions for compliance year 2018, including 32 petitions that it had previously granted. JA2945, 2964. In the June Denial, EPA issued a materially identical decision denying the remaining pending hardship petitions for 2016, 2017, 2019, 2020, and 2021. JA3141. For virtually all these petitions, this decision came well after EPA's statutory 90-day deadline—in many cases, more than two years late. *See* App'x A.

The Denials radically broke with EPA's prior approach to evaluating hardship petitions. *First*, EPA fundamentally reinterpreted the statute. EPA acknowledged that it had previously construed the Act to permit a hardship exemption if a small refinery could demonstrate disproportionate economic hardship from the RFS, even if that hardship was also caused in part by circumstances "unrelated to RFS compliance." JA3138. But EPA announced it was abandoning this holistic interpretation for a significantly narrower reading. *See* JA3138-3139.

EPA's new reading imposes four constraints on hardship exemptions: (1) small refineries must demonstrate "RFS compliance costs [that] are disproportionate compared to other refineries' RFS compliance costs," JA3138; (2) they must demonstrate "actual economic hardship" caused solely by those disproportionate compliance costs and not by other factors, JA3139 & *see* JA3124, 3149 & n.138; JA3224 & n.13; (3) EPA will consider only the cost of acquiring RINs, JA3139, 3193; JA3238; and (4) EPA will "not consider" RIN costs that exceed the amount a refinery would have paid if it had bought RINs "ratably." JA3176-3177.

*Second*, EPA laid out a new two-part economic theory of the relationship between RIN prices and fuel prices. EPA first found that all refineries that comply with the RFS by purchasing RINs "recover the cost of acquiring RINs by selling the … fuel they produce at the market price, which reflects these RIN costs." JA3151. EPA rested that finding on the assumption that obligated parties purchase RINs ratably because RIN prices vary and each day's fuel price incorporates that day's RIN price. JA3177. EPA called this theory "RIN cost passthrough." JA3151. EPA then found that small refineries that cannot blend and must purchase RINs do not face disproportionate compliance costs compared to refineries that acquire RINs through blending because the latter must discount their fuel prices by the "full value of the RIN." JA3178. EPA called this finding that blending refineries receive no benefit from the RFS program "RIN discount." JA3177-3178.

EPA drew these sweeping conclusions about all sales by all refineries in all markets based on abstract economic theorizing and data from only a few markets. JA3152. EPA did not analyze the fuel markets in which Petitioners operate, show that the studied markets were representative of all fuel markets nationwide, or focus on the compliance years of the hardship petitions at issue (2016-2021). *See, e.g.*, JA13891-13897; JA10246-10251. Nor did EPA test its hypotheses against data in its exclusive possession that, as GAO found, refute a core assumption underlying its economic theory. Even EPA's (limited) evidence showed that its theories hold at most "on average" across the industry, and EPA never reconciled its findings with the empirical literature demonstrating that these averages mask variation based on refinery size, location, and other factors. EPA has admitted that it "made no unique or individualized findings as to the ability of the thirty-six petitioning refineries to recover the costs of RFS compliance." *Calumet Shreveport Refining, LLC v. EPA*, No. 22-60266 (5th Cir. June 22, 2022), Doc. 31 at 13.

*Third*, having fashioned its own economic theory, EPA abandoned the DOE scoring matrix and recommendations it had relied on for more than a decade. Shunting DOE to the side, EPA merely "discuss[ed] various aspects" of the petition process—though *not* the validity of its new economic theory—with DOE "staff." JA2936-2937 ("Bunker Memorandum"); *see also* JA3419.

Ultimately, EPA applied its new statutory interpretation and economic theory to deny the petitions. Based on its RIN cost passthrough and RIN discount theories, EPA concluded that the cost of RFS compliance is the same for all parties and the cost is zero. JA3151; *see also* JA3241 (finding "no net cost to small refineries due to compliance with the RFS program"). Thus, EPA decided that "no small refinery experiences [disproportionate economic hardship] as a result of compliance with the RFS program." JA3139.

In separate actions concurrent with each denial decision, EPA recognized that its delays and the dysfunctional RIN market made it "nearly impossible" for small refineries to comply with the RFS for 2018. JA3035; *see also* JA3033 (conceding that the few parties holding the vast majority of available RINs would sell only at very high prices or not at all). EPA thus provided small refineries an alternative way to comply for 2018 that did not require retiring RINs. *See* JA3029. But EPA refused to take that same approach for 2019-2021, even though small refineries still face the same market constraints.

### F.    Skyrocketing RIN costs caused by EPA's actions

EPA's abrupt reversals caused RIN prices to skyrocket. On November 30, 2018—the day EPA set the 2019 volumes—the price of 2019 ethanol RINs was $0.145. OPIS End-of-Day Ethanol Assessment Report (Nov. 29, 2018). On December 2, 2019—the first business day after EPA was required to set 2020 volumes—the price of 2020 ethanol

RINs was $0.205. *Id.* (Dec. 2, 2019). But on June 3, 2022—when EPA announced the June Denial—the prices of 2019 and 2020 ethanol RINs were both $1.60, increases of *1,003%* and *680%*, respectively. *Id.* (June 3, 2022). And 2021 and 2022 ethanol RINs were similarly expensive—$1.63 and $1.61, respectively. *Id.* RIN prices thus increased as much as ten-fold while EPA left small refineries in limbo. Making matters worse, EPA's Denials significantly increased the demand, and hence the price, for a limited and fixed supply of RINs for years that had already ended. JA3122.

Petitioners consequently now face the specter of satisfying four years' worth of RIN obligations (2019-2022), totaling hundreds of millions of dollars, under a compressed schedule of just twelve months (beginning February 1, 2023), during the most expensive RIN market in history. JA16264 ¶ 12; JA16326-16329 ¶¶ 11, 19. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. Compliance with such astronomical obligations in such a compressed time-frame would be financially ruinous for many Petitioners. *See* ████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████.

### G.    GAO's report on EPA's Denials

In November 2022, following a multi-year investigation, GAO released a damning report finding that EPA has failed to responsibly manage the RFS program and cannot have any confidence in its decisions denying small-refinery hardship exemptions. JA3403-3404, 3411.

In particular, GAO found that EPA's economic theory in the April and June Denials relied on a "flawed assumption and an incomplete assessment." JA3411. As to the former, EPA's theory assumed that all parties pay and receive the same price for RINs, but EPA never analyzed the RIN market transaction data in its exclusive possession to test that hypothesis. JA3469. When GAO examined the data, it determined that EPA's assumption is empirically false. JA3412. The data show that "all parties do *not* pay the same for RINs." JS3469 (emphasis added). "Specifically, [GAO] found that smaller buyers pay more, and smaller sellers receive less, when buying or selling RINs compared to larger buyers and sellers." JA3469.

As to the incomplete assessment, GAO faulted EPA for relying on studies regarding RIN cost passthrough in a few markets "to draw conclusions about additional markets that were not examined in those studies." JA3412. Given the "important limitations" of these studies and EPA's failure to "systematically analyze th[e] small markets" at issue,

- 24 -

"EPA does not have assurance" that its passthrough theory is "based on quality information" and "risks inappropriately denying valid exemption petitions." JA3413-3415.

GAO also identified multiple deficiencies in EPA's management of the RFS program. GAO criticized EPA for failing to "specif[y] exactly what information [small] refineries would need to submit to inform EPA's evaluations" of hardship petitions under its new approach. JA3416. Indeed, "the only information EPA requires refineries to submit in their exemption petitions is information that EPA officials stated they do not plan to use." JA3416. Further, EPA has failed to establish "policies and procedures for" consulting with DOE—as the statute requires—or for "making small refinery exemption decisions." JA3417. Thus, under EPA's new regime, "EPA and DOE cannot ensure that exemption decisions are consistent or correct." JA3420. Finally, GAO confirmed that EPA's delays and reversals have created RIN-market volatility and caused small refineries to "lose out" whether or not they purchase RINs with pending petitions. JA3426-3427.

## H. EPA's December 2022 RIN price analysis

A month after GAO's criticism, EPA posted a new RIN price analysis on its website confirming GAO's conclusion that a core premise of

EPA's economic theory is empirically false.[5] EPA's data, which the agency inexplicably did not analyze before the Denials, show that small refineries pay up to 7.5% more for RINs compared with the daily average price. JA3479. They also pay more than large refineries for biomass-based diesel RINs. JA3479. EPA even found that small refineries that purchase RINs ratably (as EPA now claims they should be doing) could actually pay disproportionately *more* for those RINs than if they purchase them later. JA3479. In addition to paying more for RINs, small refineries must sell their RINs for less. JA3488. These systematic disadvantages can amount to many millions of dollars more in RFS compliance costs each year for small refineries compared to their larger competitors.

## I.    Procedural history

Petitioners challenged EPA's April and June Denials in this Court in May and August of 2022. The Regional Circuit Petitioners also filed petitions for review in the circuits where they are located. EPA moved to dismiss or transfer the regional-circuit actions. Some were transferred here, but two consolidated actions involving seven petitioners remain pending in regional circuits: *Calumet Shreveport Refining*, No. 22-60266

---

[5] EPA, An Analysis of the Price of Renewable Identification Numbers (RINs) and Small Refineries, EPA-420-R-22-038 (Dec. 2022) https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1016CAA.pdf ("EPA RIN Price Analysis") (JA3476-3488).

(5th Cir.); and *Hunt Refining Company v. EPA*, Nos. 22-11617, 12535 (11th Cir.).

In March 2023, this Court found that Calumet Montana "satisfied the stringent requirements for a stay pending court review." Order, No. 22-1073, Doc. 1992426 (Mar. 30, 2023) (per curiam).[6] The Fifth and Eleventh Circuits similarly determined that Calumet Shreveport, Wynnewood Refining, TSAR, and Hunt Refining deserved stays pending review. Orders, No. 22-12535 (11th Cir. Dec. 27, 2022), Doc. 33; No. 22-60266 (5th Cir. Mar. 16, 2023), Doc. 304; No. 22-1073 (D.C. Cir. Mar. 30, 2023), Doc. 1992426. The Fifth Circuit found that the refineries had made a "strong showing that they will succeed on the merits of their appeals" because they are "likely to prevail on at least" their argument that EPA unlawfully applied its new "disproportionate economic hardship" standard retroactively. Fifth Circuit Stay Order 6, 7, 11 (citations omitted). The Court also recognized that EPA's "new interpretation" will likely "read the exemption framework promulgated by Congress out of the statute entirely." *Id.* at 8.

---

[6] This Court denied Sinclair's Wyoming's and Sinclair Casper's motion for stay because it found that they "ha[d] not demonstrated that they would suffer irreparable harm absent a stay." Order, No. 22-1073, Doc. 1995979 (Apr. 24, 2023).

## SUMMARY OF ARGUMENT

I.    EPA's interpretations of the Clean Air Act are contrary to law.

A.    Congress required EPA to conduct a holistic evaluation of a small refinery's economic circumstances to determine whether compliance would cause "disproportionate economic hardship." This inquiry requires consideration of a refinery's full economic picture, as the magnitude of compliance costs alone is insufficient to determine whether, for a given refinery at a given time, those costs pose a hardship.

B.    In place of the statute's holistic analysis, EPA adopted a narrow interpretation that renders the hardship exemption a dead letter—as EPA acknowledged by announcing that it does not expect to ever grant hardship relief again. That decision contravenes the basic statutory interpretation principle that no provision should be treated as inoperative.

C.    EPA unlawfully redefined "disproportionate economic hardship" to mean "disproportionate compliance costs." Congress knows how to focus on "compliance costs" when it means to do so, and it did not do so here. It instead focused on hardship. Two refineries may have proportionate compliance costs but, due to different financial circumstances, face different degrees of hardship from having to bear them.

D.    EPA separately erred by inventing extra-statutory limitations on the factors it will consider in assessing "disproportionate economic hardship." In effect, EPA read the statute to prohibit considering *any* economic factors apart from the cost of RINs bought ratably. EPA arrived at

this interpretation first by misconstruing the statute to require that RFS compliance costs be the sole cause of a small refinery's hardship—although the text contains no sole-cause requirement. EPA further narrowed the exemption by confining its inquiry to a single compliance cost—RINs purchased ratably—although nothing in the statute suggests that Congress prohibited exemptions for small refineries suffering hardship associated with other costs or effects of the RFS program.

E.    EPA unlawfully refused to assess each refinery individually. The plain language and the structure of the Act show that Congress required EPA to evaluate each hardship petition on an individual basis. But EPA has admitted that the Denials were compelled by its unlawful statutory interpretation and novel economic theory, and that it made no unique or individualized findings for any particular refinery's ability to pass through RIN costs.

F.    EPA's interpretations of the Act are not entitled to *Chevron* deference. Even if EPA's interpretation were not plainly foreclosed by the statute, its reading is unreasonable in light of the Act's structure and design. Moreover, *Chevron* deference is inappropriate where the statutory provision at issue is administered by more than one agency, and EPA and DOE both have independent roles in implementing the hardship exemption. Also, *Chevron* deference does not apply to EPA's informal adjudication of hardship petitions.

II.    EPA's Denials are also unlawful because they are arbitrary and capricious for multiple independent reasons.

A.    EPA erred first by failing to justify a key assumption of its RIN discount and passthrough theories: that all refineries pay the same price for RINs. Although EPA had data in its exclusive possession that it could have used to test this assumption, EPA did not examine those data. Had it done so, it would have found, as GAO did when it studied the data, that smaller parties pay more for RINs—a finding that undercuts EPA's entire economic analysis.

B.    EPA also lacked support for its sweeping conclusion that *all* refineries in *all* markets pass through *all* of their RIN costs when they sell their fuel. That conclusion is inconsistent with the academic literature and cannot reasonably be extrapolated from the evidence on which EPA relied, which shows at most that *some* refineries in *some* markets pass through RIN costs *some* of the time.

C.    Similarly, EPA failed to support its generalization that all blenders discount the price of their fuel by the full value of the RINs they produce. EPA's data from limited markets and a handful of fuel sales contracts provide no basis for its assertion that the RIN discount phenomenon occurs in all markets and all contracts at all times.

D.    EPA's RIN passthrough theory incorrectly and unreasonably assumes that refineries purchase all their RINs ratably. As EPA itself has acknowledged, refineries can and do purchase RINs non-ratably.

Indeed, it is often infeasible for small refineries to purchase RINs ratably. It was arbitrary for EPA to rely on an economic theory that fails to account for real-world economic conditions.

E.      Finally, the Denials are arbitrary and capricious because EPA began with a preordained result and worked backwards to reach it. EPA purported to rely on the Tenth Circuit's vacated judgment in *RFA* that has no legal force. EPA did not meaningfully consult with DOE as the statute requires. Nor did EPA provide clear guidance on the standards by which hardship petitions will be adjudicated.

III.     EPA violated Petitioners' due process rights, the Administrative Procedure Act, and the Clean Air Act when it belatedly and retroactively applied a new standard for adjudicating hardship petitions.

A.      Petitioners relied on EPA's prior, settled approach—under which they had repeatedly received hardship relief—to prepare their 2016-2021 hardship petitions and determine their compliance strategy. EPA then denied those petitions under a new, completely different legal and economic framework, long after those compliance years were over. Applying that framework retroactively was manifestly unjust.

B.      Even if EPA were entitled to retroactively apply this new framework, it failed to fulfill its obligation to ameliorate the harm that its flagrant failure to meet the statutory deadlines for adjudicating the hardship petitions caused for compliance years 2019-2021.

IV.  EPA acted unlawfully when it disqualified both ███████ ██████████████ from hardship relief. Both refineries have received relief in the past, and EPA may not suspend their eligibility for something they supposedly did not do back in 2004 and 2006.

A.  For ██████████████, one of the very smallest refineries in the U.S., EPA refused to extend the exemption because ████████████ ████████████████████████████████████████████████████. But the Act's plain text applies that exemption to "small refineries" based solely on the refinery's size. EPA's decision to create retroactively new criteria that are not in the Act (or EPA's implementing regulations) is arbitrary and capricious, and contrary to law.

B.  For ██████████, EPA also erred by retroactively adding new eligibility criteria not in the statute. Moreover, those new criteria contradict EPA's existing regulations. EPA further concluded that ██████████ refinery was not "small" by aggregating its production with that of another refinery on a separate property, ignoring their evidence of separateness and contradicting EPA's own regulations. EPA's disregard for the Act and its own regulations is contrary to law and arbitrary and capricious.

## STANDING

Petitioners have standing to seek review of the April and June Denials. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); D.C. Cir. R. 28. Petitioners are "object[s] of the[se]" "adjudication[s]," EPA's

"'action[s] … ha[ve] caused [Petitioners] injury, and … a judgment pre-venting or requiring the action will redress it.'" *Id.* at 900 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)). EPA's denials of Peti-tioners' hardship petitions for compliance years 2016 to 2021 cost Peti-tioners billions of dollars collectively, and a judgment from this Court vacating and remanding those denials with the instructions set forth herein will redress those injuries.

## STANDARD OF REVIEW

This Court will "hold unlawful and set aside agency action, find-ings, and conclusions" that are "arbitrary, capricious, an abuse of discre-tion," "in excess of statutory … authority," or "otherwise not in accord-ance with law." 5 U.S.C. § 706(2). Under this standard, an agency must engage in reasoned decision making, *Michigan v. EPA*, 576 U.S. 743, 750 (2015), meaning it must "examine the relevant data and articulate a sat-isfactory explanation for its action," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Con-gress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 34, 43.

# ARGUMENT

## I. EPA's new interpretations of the Clean Air Act are contrary to law.

In recent years, both the Supreme Court and Tenth Circuit have held that EPA construed the hardship exemption for small refineries more narrowly than the statutory text allows. *See HollyFrontier*, 141 S. Ct. at 2180; *Sinclair Wyoming Refining Co. v. EPA*, 887 F.3d 986, 988 (10th Cir. 2017). Undeterred, in the April and June Denials, EPA repeats this mistake. EPA's interpretations of the Act ignore the factors Congress directed it to consider, impose requirements absent from the statutory text that improperly narrow the inquiry, and violate the statutorily required process for evaluating exemption petitions. The net result of these errors is that EPA reads the hardship exemption to be a dead letter—the very result EPA has sought to achieve all along. But "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Because EPA's interpretations "displace the statutory determination" governing hardship exemptions, the Denials must be set aside. *Murray Energy Corp. v. EPA*, 936 F.3d 597, 626 (D.C. Cir. 2019).

### A. Congress requires a holistic analysis of a small refinery's ability to comply with the RFS.

When Congress enacted the RFS program, it provided regulatory relief for small refineries by allowing them to "at any time petition [EPA] for an extension of the exemption … for the reason of disproportionate

economic hardship." § 7545(o)(9)(B)(i). The statutory standard for an exemption is thus whether "compliance with the [RFS] would impose a disproportionate economic hardship" on a small refinery. § 7545(o)(9)(A)(ii)(I). Several requirements are evident from the plain meaning of that text. *See BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021) (explaining that a court's "task is to discern and apply the law's plain meaning as faithfully as [it] can").

*First*, compliance with the RFS program must be a causal factor contributing to the small refinery's economic hardship. *See* Impose, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002) ("to cause to be burdened").

*Second*, to ascertain whether compliance results in "economic hardship," EPA must conduct a "holistic evaluation" of the small refinery's economic circumstances. *Sinclair Wyoming*, 887 F.3d at 997. A "hardship" is a "circumstance" that is "hard to bear." Hardship, *Oxford English Dictionary* (3d ed. 2015); *see Sinclair Wyoming*, 887 F.3d at 997 (citing similar definitions of "hardship"). The statute thus requires EPA to determine whether RFS compliance would impose economic circumstances on a small refinery that are hard for it to bear. This determination necessarily requires consideration of the refinery's full economic picture, as compliance costs alone do not reveal whether, for a given refinery at a given time, those costs pose a hardship. The Supreme Court recognized this in *HollyFrontier*, noting that a refinery might apply

for exemptions in some years but not others "in light of market fluctuations and changing hardship conditions." 141 S. Ct. at 2179.

*Third*, determining whether a refinery faces "disproportionate" economic hardship "inherently requires a comparative evaluation." *Sinclair Wyoming*, 887 F.3d at 997. As the Tenth Circuit has explained, "EPA must compare the effect of the RFS Program compliance costs on a given refinery with the economic state of other refineries." *Id.* Again, the touchstone is the relative "*effect* of RFS Program compliance costs" on a refinery, *id.* (emphasis added), not the costs themselves.

### B. EPA effectively eliminated the statutory hardship exemption for small refineries.

EPA's interpretation falters out of the gate because it violates the "elementary canon of construction that a statute should be interpreted so as not to render" any provision "inoperative." *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (citation omitted); *see Ysleta del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (courts give "effect … to all provisions, so that no part [of a statute] will be inoperative or superfluous, void or insignificant") (citation omitted). That EPA interprets the hardship exemption "to be an empty gesture" that no small refinery can obtain is the first "indication" that its interpretation is "erroneous." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 878 (D.C. Cir. 2006).

EPA concluded that Congress authorized hardship exemptions only for small refineries that can show (1) that their "RFS compliance costs are disproportionate compared to other refineries' RFS compliance costs" and (2) "actual economic hardship" caused *solely* by those disproportionate RFS compliance costs. JA3138-3139; *see also* JA3149 & n.138 ("Granting extensions of exemptions based at least in part on hardships not caused by RFS compliance [i]s outside the scope of the EPA's statutory authority." (quoting *RFA*, 948 F.3d at 1254)). And EPA then determined that because the "cost of RINs is the same for all obligated parties" and the "costs of RFS compliance (*i.e.*, RINs) are passed through in the prices of refined products," small refineries invariably face neither a "disproportionate cost of compliance" nor "economic hardship due to compliance with the RFS program." JA3193; *see also, e.g.*, JA3139 ("[N]o small refinery experiences [disproportionate economic hardship] as a result of compliance with the RFS program."); JA3147 ("[W]e find small refineries do not face disproportionate costs to comply with the RFS program."); JA3151 ("[W]e conclude that the RFS program does not impose [disproportionate economic hardship] on small refineries.").

EPA thus ensured that no refinery could qualify for relief, rendering the hardship exemption "meaningless." *Fund for Animals*, 472 F.3d at 877. But EPA cannot "effectively repeal" the hardship exemption that Congress created. *U.S. Dep't of Veterans Affs. v. Fed. Lab. Rels. Auth.*, 9 F.3d 123, 130 (D.C. Cir. 1993). "Even accepting that Congress on occa-

sion may enact" statutory provisions "that tur[n] out to have no effect," courts must "presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence." *Fund for Animals*, 472 F.3d at 877. That presumption is not overcome here. Congress designed a framework for exempting small refineries from the RFS, and it allowed small refineries to seek relief "at any time." § 7545(o)(9)(B)(i). EPA cannot nullify that framework by reading "at any time" to mean "never."

In effectively reading the hardship exemption out of the statute, EPA commits a variation of the error it made in *HollyFrontier*. There, EPA contended that the hardship exemption "was designed as a narrow exception to a 2013 sunset rule" and "should therefore be construed narrowly to end as quickly as possible." 141 S. Ct. at 2180. The Supreme Court rejected this view, emphasizing that the statute "expressly contemplates exemptions beyond 2013—'at any time' hardship conditions are satisfied." *Id.* "If Congress really had wanted all exemptions to cease after a temporary period, that was surely an odd way to achieve it." *Id.* at 2180, 2182-2183 ("[p]ermanently shuttering existing small refineries … sits uneasily with even the respondents' account of the statute's purposes").

Likewise here, EPA's interpretation ignores that Congress "expressly contemplate[d] exemptions beyond 2013." *Id.* at 2180. If anything, EPA's position here is even more extreme than in *HollyFrontier*, because it implies not only that EPA should grant no future exemptions,

but also that EPA should never have granted any post-2013 exemptions to begin with. As in *HollyFrontier*, if Congress had intended to authorize EPA to make a categorical determination that small refineries are ineligible for relief, it surely would have said so, rather than allowing small refineries to seek relief "at any time."

This Court should "decline to adopt an interpretation" of the hardship exemption that "would render it a dead letter." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 514 (1990). At a minimum, that EPA's reading would render the hardship exemption inoperative "should have alerted EPA that it had taken a wrong interpretive turn." *Utility Air*, 573 U.S. at 328. In fact, as detailed below, EPA took several.

## C.     EPA unlawfully redefined "disproportionate economic hardship."

Congress authorized EPA to exempt a small refinery that faces "disproportionate economic hardship." § 7545(o)(9)(B)(i). But EPA conducted an altogether different inquiry here, demanding that each small refinery demonstrate "how its specific RFS compliance costs are disproportionate compared to other refineries' RFS compliance costs." JA3138. Doubling down on its error, EPA further insisted that small refineries' "compliance costs" be of "sufficient magnitude to warrant the exemption." JA3138. EPA thus transformed the statute's exemption for refineries experiencing "disproportionate *economic hardship*," § 7545(o)(9)(B)(i) (emphasis added), into an exemption for refineries with "disproportionate RFS

*compliance costs*," JA3139 (emphasis added). EPA made no attempt to justify this choice, which is plainly incompatible with the statutory text.

EPA was wrong to equate "economic hardship" with "compliance costs." These are obviously distinct concepts. A "cost" is an "expense," Cost, *Oxford English Dictionary* (3d ed. 2015), while a "hardship," as noted above, is a "circumstance" that is "hard to bear." *See* Argument I.A. *see also Hermes Consol., LLC v. EPA*, 787 F.3d 568, 575 (D.C. Cir. 2015) (distinguishing "cost" and "hardship"). Thus, even if small refineries' compliance-related "expenses" were the same as those of other refineries, those identical costs could be disproportionately "hard" for small refineries "to bear" given their different characteristics and circumstances. *See* Statement II.C. In the same way that a flat tax rate could impose greater economic hardship on low-income taxpayers than on high-income taxpayers, the same RFS compliance costs can impose disproportionate economic hardship on small refineries. For example, if complying with the RFS cost every refinery $1 per gallon of fuel sold, then all refineries (large and small) would face proportionate compliance costs, but those costs could disproportionately burden small refineries like Petitioners, which operate with lower margins.

Congress understands that "compliance costs" and "economic hardship" are not the same thing, and it would not have conditioned the exemption on "economic hardship" if it had intended to limit the inquiry to "compliance costs." Congress often instructs EPA to consider the "cost

of compliance," so it clearly knows how to tell EPA to consider compliance costs. *See, e.g.*, §§ 4905(c)(1), 4916(a)(1), 4917(a)(1), 7419(b)(3), 7491(g)(1), 7511b(f)(1)(B), 7521(a)(2), 7547(b), 7571(b), 7617(c)(1). Congress also sometimes instructs agencies to consider *both* the "cost of compliance" *and* "economic hardship," indicating that Congress attaches distinct meanings to the different terms. *See, e.g.*, 21 U.S.C. § 360eee-1(g)(4)(A)(ii)(II), (iii)(III); *id.* § 2223(d)(1)(D), (I); *see Ysleta del Sur Pueblo*, 142 S. Ct. at 1939 (invoking the "usual presumption that 'differences in language … convey differences in meaning'") (citation omitted).

In addition to conflating words, EPA confuses cause and effect. In asking "whether compliance … would impose a disproportionate economic hardship on small refineries," § 7545(o)(9)(A)(ii)(I), and whether a small refinery "would be subject to a disproportionate economic hardship if required to comply," § 7545(o)(9)(A)(ii)(II), Congress focused the inquiry on the economic *effect* that RFS compliance would have on small refineries. Compliance costs may be a *cause* of that effect, but they are not themselves the effect that EPA must assess. Rather, Congress required EPA to look beyond RFS compliance costs to the resulting economic hardship. In so doing, Congress employed a familiar model for relieving economic hardship caused by regulation.[7]

_____

[7] *See, e.g.*, 49 U.S.C. § 30113(b)(3)(B)(i) (authorizing a regulatory exemption if "compliance … would cause substantial economic hardship to a

In short, "Congress kn[o]w[s] how" to refer to compliance costs "when it so desire[s]." *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 879-80 (D.C. Cir. 2014). If Congress had intended to require proof that compliance with the RFS would impose disproportionate *compliance costs* on small refineries, it would have said so. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003) (rejecting interpretation as inconsistent with use of particular "language" in "[v]arious federal statutes"). Instead, Congress required EPA to assess whether a small refinery would be subject to disproporionate *economic hardship*—a different and more holistic inquiry. EPA cannot "tak[e] the holistic evaluation required by Congress and morph[ ] it into a single question," much less the wrong question. *Sinclair Wyoming*, 887 F.3d at 997.

### D. EPA unlawfully limited the factors to be considered in determining whether a small refinery is subject to disproportionate economic hardship.

EPA erred next by inventing extra-statutory limitations on the factors that may be considered in assessing whether a small refinery is sub-

---

manufacturer"); 16 U.S.C. § 1539(b)(1)-(2) (authorizing a "hardship exemption" if application of statutory requirements "will cause undue economic hardship" and defining "undue economic hardship" to include various kinds of consequential economic losses); 21 U.S.C. § 360eee-1(a)(3)(A)(i) (authorizing waiver of statutory requirements if they "would result in an undue economic hardship"); *id.* § 2223(d)(1)(I) (authorizing waiver of statutory requirements if they "would result in an economic hardship"); *id.* § 364b(b) (requiring agency to "ensure that [its] regulations do not impose undue economic hardship for smaller businesses").

ject to "disproportionate economic hardship." EPA reads the statute to prohibit it from considering *any* economic factors affecting a small refinery apart from the cost of RINs bought ratably. But that limitation is nowhere in the statute. Congress knows how to limit the factors agencies may consider.[8] And it did not "tie the agency's hands" in the way EPA imagines. *Hermes*, 787 F.3d at 575. EPA thus erred by reading the statute to "impos[e] … limits on [its] discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020); *see also Fed. Power Comm'n v. Conway Corp.*, 426 U.S. 271, 277-79 (1976) (invalidating agency interpretation constraining factors to be weighed in taking action). But the problem with EPA's interpretation is even worse, because the restrictions it invented not only lack any basis in the statutory text, structure, or purpose—they defeat the holistic inquiry Congress required. *See Nat. Res. Def. Council v. EPA,* 489 F.3d 1250, 1258 (D.C. Cir. 2007) (agency cannot "constric[t] the scope of [a statute's] plain, broad language").

---

[8] *See, e.g.*, 49 U.S.C. § 32902(h) (directing agency to set fuel-economy standards without considering specified compliance flexibilities); *id.* § 41734(h) (directing agency to determine "basic essential air service" without considering "slot availability" at certain airports); 42 U.S.C. § 300gg-111(c)(5)(D) (directing arbitrators not to consider certain rates in determining reimbursement amounts for healthcare services); 16 U.S.C. § 808(d)(1) (directing the Federal Energy Regulatory Commission not to consider adequacy of transmission facilities).

1.    EPA unlawfully narrowed the hardship exemption first by misconstruing the statute to require that compliance costs be the sole cause of disproportionate economic hardship. EPA explained that it had "revise[d]" its interpretation to extend exemptions "only to small refineries whose claimed [disproportionate economic hardship] is caused by the cost of complying with the RFS program and not by other factors." JA3124. Under this interpretation, EPA will "not consider economic factors in its evaluation of … petitions that may show a small refinery is struggling financially when those struggles are unrelated to its RFS compliance." JA3138; *see also* JA3149 & n.138. This blinkered view of the hardship analysis is unlawful.

Nothing in the statutory text requires that compliance with the RFS be the *sole* cause of a refinery's economic hardship. While the condition that "compliance with the requirements of [the RFS] would impose a disproportionate economic hardship" requires that RFS compliance be *a* cause, § 7545(o)(9)(A)(ii), (B)(i), the statute does not say that RFS compliance *by itself* must impose the disproportionate economic hardship or that the hardship must be due *solely* to RFS compliance. This Court has specifically held that it "will not read the word 'only' into [a] statute 'when Congress has left it out,'" *Blue Water Navy Vietnam Veterans Ass'n v. McDonald*, 830 F.3d 570, 575 (D.C. Cir. 2016) (citation omitted), because neither a court nor an agency may "narrow a provision's reach by inserting words Congress chose to omit," *Lomax v.*

*Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020). EPA misconstrues the hardship exemption by attempting to do just that.

EPA made a similar error in *Sinclair Wyoming*. The Tenth Circuit held that EPA had "improperly imported a condition of future long-term viability into the statutory language," thereby converting a holistic, multi-factor analysis into one focused on a single variable. 887 F.3d at 996. Here, similarly, EPA has ratcheted up the exemption standard by importing a condition—that hardship be due *solely* to compliance costs— absent from the statutory language.

EPA's error is especially clear given that Congress knows how to require sole causation, as evidenced by the numerous provisions in the Act itself expressly providing for it. *See, e.g.*, §§ 7407(e)(3), 7412(b)(2), 7412(b)(3), 7412(b)(4), 7412(b)(7)(F), 7545(t)(8). These provisions include waivers from otherwise applicable requirements, similar to the exemption at issue here. In § 7410(f)(5), for example, Congress provided that in the event a governor obtains a temporary suspension of certain implementation plans due to a national or regional emergency, the governor may also temporarily delay certain compliance schedules applicable to a stationary source "upon a finding that such source is unable to comply with such schedule … *solely because* of the conditions on the basis of which a suspension was issued under this subsection." § 7410(f)(5) (emphasis added); *see also* § 7420(a)(2)(B).

The absence of similar language here confirms that Congress did not require small refineries to demonstrate that they are experiencing disproportionate economic hardship *solely because* of RFS compliance. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (recognizing the "usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (cleaned up)); *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018) (looking to statutory "context" to construe an "undefined causation requirement"). Rather, Congress required EPA to consider the broader economic circumstances a small refinery faces to determine whether RFS compliance is *a* factor among others contributing to the refinery's disproportionate economic hardship. EPA's contrary interpretation improperly "introduc[es] a limitation not found in the statute." *Little Sisters*, 140 S. Ct. at 2381.

Moreover, as discussed above, a holistic analysis of a small refinery's circumstances is inherent in the concept of "economic hardship." By themselves, compliance costs are just a number that is meaningless in isolation. EPA can determine whether RFS compliance would impose an "economic hardship"—that is, an economic circumstance that is hard to bear, *see* Argument I.A—only by evaluating how RFS compliance would affect a refinery in light of its overall economic situation. Costs that one refinery could easily manage may be a severe difficulty for another if, for example, the latter is "experienc[ing]

a year of poor economic performance," facing "disadvantageous operational or market constraints," or otherwise "struggling financially"—the very circumstances that EPA refuses to consider. JA3139, 3149; *cf. HollyFrontier*, 141 S. Ct. at 2179 (explaining that "market fluctuations and changing hardship conditions" may affect whether a small refinery seeks an exemption in a given year). By limiting its analysis, EPA has disregarded the plain meaning of "economic hardship" and denied exemptions to small refineries that meet the statutory standard based on the aggravating impact that RFS compliance would have on their already straitened circumstances.[9]

EPA nevertheless claims that its interpretation "aligns with the statutory text as well as with the purpose of the RFS program and the [small-refinery] provisions," JA3148, but neither is the case. EPA's analysis of the statutory text tellingly offers no basis for the agency's view that compliance costs must be the *sole*, as opposed to *a*, cause of a petitioner's disproportionate economic hardship. *See* JA3148-3149. And

---

[9] EPA's interpretation is also contrary to Congress's express guidance. After DOE first issued the study required by § 7545(o)(9)(A)(ii)(I), Congress directed the agency to redo it, faulting the agency for, among other things, "not assess[ing] the economic condition of the small refining sector" or "tak[ing] into account regional factors." S. Rep. No. 111-45, at 109 (2009). Congress specifically directed DOE to "evaluate the financial health and ability of small refineries to meet RFS requirements." *Id.* Yet that is precisely the analysis that EPA now interprets the same statutory provision to forbid.

EPA's analysis of the statutory purpose illogically construes the hardship exemption in light of the very requirements the exemption exists to "temper[ ]." *HollyFrontier*, 141 S. Ct. at 2175. EPA says its interpretation "furthers the goals of the RFS program, which include encouraging the use of renewable fuel and reducing greenhouse gas emissions." JA3149. But as this Court has recognized, Congress "did not pursue its purposes of increased renewable fuel generation at all costs." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 714 (D.C. Cir. 2017) (cleaned up). When Congress created an exemption from the requirement to use renewable fuel, it clearly had purposes other than encouraging the use of such fuel— purposes EPA ignored. "Exceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *BP*, 141 S. Ct. at 1539; *see also HollyFrontier*, 141 S. Ct. at 2181 ("[S]tatutory exceptions are to be read fairly, not narrowly.").

In reality, EPA's extra-textual sole-causation requirement *undermines* the purpose of the hardship exemption. As the Supreme Court recognized, Congress created the exemption because it "was concerned that escalating [RFS] obligations could work special burdens on small refineries that lack the inherent scale advantages of large refineries and sometimes supply a major source of jobs in rural communities." *HollyFrontier*, 141 S. Ct. at 2175 (cleaned up). Those concerns apply equally to small refineries facing economic hardship from compliance costs *alone* as to those facing hardship from compliance costs

*in combination with* other economic factors. EPA offers no reason to believe that Congress intended to deny regulatory relief to a small refinery that would suffer severe economic distress, and potentially even go out of business, if required to comply with the RFS just because a different refinery—or even the same refinery at a different time under different economic circumstances—could absorb RFS compliance costs without experiencing disproportionate economic hardship. Neither the statute's text nor purpose supports this outcome.

2.      EPA committed a related error when it concluded that, in assessing whether a small refinery is subject to disproportionate economic hardship, the agency "may not consider" the cost of acquiring RINs if the RINs are not purchased ratably. JA3177. For EPA's RIN passthrough theory to hold, refineries must always purchase RINs ratably. JA3176. As EPA acknowledged, if refineries purchase RINs non-ratably, and the price of RINs when they are bought exceeds the price of RINs when the fuel is sold, then the refineries will recover "less than the price they paid for RINs in the sales price of the petroleum fuel they sell." JA3176. In other words, refineries will not pass through their full RIN costs to customers. As discussed below, it often is not feasible or reasonable for small refineries to buy RINs ratably to exactly match their fuel sales in real time throughout the compliance year, and it was therefore arbitrary and capricious for EPA to rely on an economic theory that fails in real-world conditions. *See* Argument II.D.

But there is an even more fundamental problem with EPA's theory: it rests on a mistaken interpretation of the statute. According to EPA, the cost of RINs bought non-ratably "does not constitute [disproportionate economic hardship] *caused* by the cost of compliance with the RFS program, and therefore cannot be the basis for hardship relief," because the timing of RIN purchases is a "business choice." JA3177. So even if a small refinery purchases RINs for the sole purpose of complying with the RFS, and even if the full cost of those RINs cannot be passed through and causes significant economic hardship for the small refinery, that hardship cannot be the basis for an exemption because, in EPA's view, the small refinery could theoretically have avoided the hardship by purchasing the RINs for less at a different time.

Nothing in the statute supports, let alone compels, that conclusion. The cost of buying RINs needed to comply with the RFS is clearly a compliance cost, regardless of when the RINs are bought. The compliance obligation is the cause of the RIN cost because, but for that obligation, the cost would not be incurred. *See Burrage v. United States*, 571 U.S. 204, 212 (2014) ("[I]t is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter."). "[I]t is the RFS that forces small refiners to purchase RINs and thus decide when to purchase RINs; whatever the cost, that cost is imposed by the RFS." JA361 n.54.

EPA's position thus boils down to the view that even if the need to comply with the RFS is a but-for cause of a given cost, that cost cannot impose disproportionate economic hardship within the statute's meaning if the cost was hypothetically avoidable through a different compliance strategy. In effect, EPA reads a proximate-cause requirement into the statute and treats a small refinery's decision to purchase RINs non-ratably as a superseding cause that necessarily breaks the chain of causation between the RFS and the small refinery's economic hardship. But EPA provides no justification for reading a proximate-cause requirement into the statute. The text imposes no proximate-cause requirement, and EPA identifies no statutory or common-law background suggesting Congress intended to incorporate one. *Cf. Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992); *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 529-36 (1983).

Regardless, even if the hardship exemption incorporates a version of proximate causation, it would not support EPA's rigid position that hardship resulting from non-ratable RIN purchases can never justify an exemption. Proximate causation is "a flexible concept" designed to ensure that the "causal link" is not "so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014). That is not the case here. For one, it is foreseeable that small refineries will not purchase all their RINs ratably. *See id.* ("Proximate

cause is often explicated in terms of foreseeability ….”). EPA can hardly contend otherwise. Not only has it never required refineries to purchase RINs ratably; it has expressly declined to require “real-time” RIN retirement because “[i]t would be virtually impossible for the market to instantaneously meet such tight demand for RINs.” 84 Fed. Reg. at 10,616. As EPA explained, the “lack of alignment in time between RIN generation and gasoline/diesel fuel demand renders ‘real time’ RIN retirement infeasible,” so “it is important to provide some margin of time-flexibility to allow obligated parties to acquire RINs for compliance.” *Id.*[10] Thus, even if buying RINs non-ratably is a “business choice,” it is a foreseeable choice made in response to RFS compliance obligations and is not a superseding cause. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2016) (“A cause can be thought ‘superseding’ only if it is a ‘cause of independent origin that was not foreseeable.’”) (citation omitted).

Moreover, “proximate-cause analysis is controlled by the nature of the statut[e].” *Lexmark Int’l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). And nothing in the statute suggests that Congress intended to categorically bar small refineries from receiving a hardship exemption just because they purchased RINs non-ratably. There is no

---

[10] In the same action, EPA proposed to require quarterly RIN retirement, concluding this would “provid[e] enough flexibility for obligated parties to feasibly comply.” 84 Fed. Reg. at 10,616. But EPA ultimately abandoned even that proposal. 84 Fed. Reg. 26,980, 27,019 (June 10, 2019).

basis for EPA's assertion that non-ratable RIN purchases are *ipso facto* "contrary to the purpose of the program." JA3177. If that were so, EPA could not lawfully "allow refineries to choose when they acquire RINs." JA3177. Yet by allowing refineries to carry forward a RIN deficit from one year to the next, Congress gave refineries exactly that choice. *See* § 7545(o)(5)(D). As discussed below, purchasing RINs non-ratably is often the only feasible compliance option for small refineries or, at a minimum, a reasonable compliance strategy. *See* Argument II.D. And nothing in the statute suggests that Congress barred EPA from granting a hardship exemption to small refineries that suffer disproportionate economic hardship from non-ratable RIN purchases that reflect good-faith, reasonable efforts to comply with the RFS.

3.      Finally, EPA erred in concluding that it may not consider the economic hardship associated with the depressed demand for petroleum fuels resulting from the RFS program. JA3238. Contrary to EPA's pretense, the RFS program is not costless. It invariably imposes economic costs on obligated refineries—even accepting EPA's economic theories as true. As commenters explained, even if refineries pass on 100% of their RIN costs, consumers will respond to the price increase by decreasing their fuel purchases. JA776; JA1244, 1279. And the RFS program itself, by displacing petroleum fuels with renewable fuels, reduces the demand for petroleum fuels. EPA agrees: "a reduction in demand should be expected both due to the marginally higher cost of renewable fuels and

further due to direct substitution of renewable fuels for petroleum fuels under the RFS program." JA3238.

This decrease in product volume is not distributed equally across refineries. JA776. The highest-cost producers see the greatest demand loss, and small refineries are very often the highest-cost producers in their markets. JA776. Even if losses were spread evenly, small refineries generally have higher fixed costs per gallon, so lost volumes can have a greater impact on their profit margins. JA776.

EPA nonetheless concluded that the statute precludes it from addressing economic hardship associated with these market-distorting effects of the RFS program. JA3238. According to EPA, "these generalized market outcomes are [not] the kinds of direct, individual-refinery impacts that Congress intended the [small-refinery-exemption] provisions to address," because "the very purpose of the RFS program is to displace petroleum fuel with renewable fuel," and Congress did not likely "intend to waive the very mandate it set simply because that mandate was having its intended effect." JA3238.

EPA is wrong. The hardship exemption on its face reflects Congress's intent to protect small refineries from regulatory burdens created by the RFS program. And one of those regulatory burdens is the loss of sales resulting from the increased price of petroleum fuels. *See* JA3169 ("The RFS program functions as a cross-subsidy, where RINs increase the market price of petroleum fuel … and decrease the net price

of renewable fuel."). Contrary to EPA's assertion, those lost sales are "direct, individual-refinery impacts"—they represent lost revenue and profits that refineries would otherwise earn. And nothing in the statute precludes EPA from considering them. A regulatory exemption by its nature protects its recipient from the regulation's "intended effect." And in authorizing hardship exemptions for small refineries, Congress made clear that it did not intend to pursue the purpose of displacing petroleum fuel with renewable fuel at the cost of imposing disproportionate economic hardship on small refineries. *See Luna Perez v. Sturgis Pub. Sch.*, 143 S. Ct. 859, 865 (2023) ("Laws are the product of compromise, and no law pursues its purposes at all costs." (cleaned up)).

Nor is there any basis for EPA's assertion that demand depression "do[es] not disproportionately impact small refineries." JA3238. EPA offered no response to the comments summarized above describing how small refineries are disproportionately harmed when demand for petroleum fuels decreases. Instead, it fell back on its erroneous argument that if compliance costs are the same for all refineries, then they cannot impose disproportionate economic hardship on small refineries. JA3238; *see* Argument I.C (refuting this argument).

To the extent EPA claims that lost sales are not "'due to compliance' with the RFS program," JA3238, that too is wrong. If small refineries did not have to buy RINs to comply with the RFS, they would not have to

attempt to raise their prices and thus would not experience the demand depression caused by higher prices.

Alternatively, exempted small refineries could sell less fuel at the higher market price set by obligated refineries, which according to EPA will reflect RIN costs. JA3156. Because exempted small refineries in this scenario would receive prices reflecting RIN costs but would not incur RIN costs, EPA says the exemption would create a "windfall." JA3150. In fact, however, the higher profit margins that EPA calls a "windfall" help offset the lower quantity demanded at the higher market price reflecting RIN costs. Exempting small refineries that are disproportionately harmed by lower volumes thus does not grant those small refineries "a disproportionate net benefit." *Id.* It relieves them of the cost of complying with the RFS, precisely as Congress intended.

### E. EPA failed to consider each refinery petition individually, as the statute requires.

The Act requires EPA to decide hardship petitions on an individual, case-by-case basis, but EPA denied 105 petitions in the April and June Denials without making any individualized determinations.

1. The plain language of the Act provides that EPA must decide hardship petitions individually: "*A* small refinery may at any time petition" for hardship relief based on "disproportionate economic hardship." § 7545(o)(9)(B)(i) (emphasis added). Likewise, EPA's charge is to evaluate whether "*a* petition" demonstrates hardship. § 7545(o)(9)(B)(ii) (em-

phasis added). Those terms "inherently require[ ] a comparative evaluation" of "the effect of the RFS Program compliance costs on a given refinery with the economic state of other refineries." *Sinclair Wyoming*, 887 F.3d at 997; *see also Ergon-West Virginia, Inc. v. EPA*, 896 F.3d 600, 613 (4th Cir. 2018) (vacating EPA's decision for failure to "address Ergon's specific evidence regarding RIN costs"). Even EPA has acknowledged that its evaluation of a hardship petition must be based on "data, contracts, and other information" relevant to individual petitions received "from small refineries." JA3147.

Congress also built the individualized nature of adjudicating hardship petitions into the statutory structure. When Congress initially created the RFS, it provided automatic, blanket hardship relief to *all* small refineries through 2011. § 7545(o)(9)(A)(i). Congress then directed EPA to extend that blanket exemption for at least two years to any small refinery that DOE determined would suffer "disproportionate economic hardship." § 7545(o)(9)(A)(ii)(II).[11] When that two-year extension window ended, Congress put the onus on small refineries themselves to petition for relief. § 7545(o)(9)(B). They must show "disproportionate economic hardship" on an individual, refinery-specific basis. *Id.* To evaluate those petitions consistent with the statute, EPA's decisions must be individualized and refinery-specific.

---

[11] DOE determined that 13 small refineries should receive the exemption for 2011 and 2012.

Despite the statute's straightforward command that EPA must individually evaluate each hardship petition, EPA has conceded that it "made no unique or individualized findings as to the ability of any of the … petitioning small refineries" to pass on RIN costs. EPA Mot. to Transfer at 13, No. 22-60266 (5th Cir. June 22, 2022), Doc. 31. Without individualized findings, EPA cannot adequately comply with its statutory obligation to assess the relative hardship faced by a given refinery. *See Ergon-West Virginia*, 896 F.3d at 613 (vacating EPA decision for relying on "an industry-wide study and a nonspecific nationwide trend to find that RIN prices would not harm" a specific small refinery); *Sinclair Wyoming*, 887 F.3d at 997 (holding that EPA's interpretation was contrary to law where it read "out of the statute" the individualized comparative analysis that is inherent in the "disproportionate" economic hardship standard).

2.    EPA's failure to evaluate each hardship petition on its individual merits is not remedied by EPA's "confidential, refinery-specific appendices" or EPA's assertion that it "reviewed all the information" the parties submitted. JA3139. By its own admission, EPA's new RIN passthrough theory "render[ed] irrelevant most *or all* local factors." EPA Reply at 7, No. 22-60425 (5th Cir. Sept. 26, 2022), Doc. 74 (emphasis added). Based on that theory, EPA found it "*unlikely* any one refinery would face disproportionate cost of compliance." JA3140 (emphasis added). But even if that were the right test (and it is not, *see* Argument

I.C), a conclusion that it is "unlikely" any refinery would face disproportionate compliance costs is not the same as faithfully determining whether a particular small refinery *actually* did.

In short, the Act requires EPA to evaluate each hardship petition and determine whether *that petitioner* would experience disproportionate economic hardship. EPA's failure to do so is another reason why this Court should set aside the April and June Denials.

### F.    EPA's interpretations of the hardship exemption are not entitled to any deference.

Finally, EPA's interpretations of the hardship exemption are not entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), for four reasons.

*First*, EPA's interpretations fail at both steps of *Chevron*. The "traditional tools of statutory interpretation" unambiguously foreclose EPA's reading. *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1906 (2022). And even if there were ambiguity, EPA's reading—which effectively erases the hardship exemption from the statute—exceeds "the bounds of reasonable interpretation." *Utility Air*, 573 U.S. at 321 (rejecting as unreasonable an EPA interpretation that "would be inconsistent with—in fact, would overthrow—the Act's structure and design").

*Second*, "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference." *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000). That is the case here.

DOE has its own independent role to play in administering the hardship exemption. Indeed, DOE was the agency first called upon to determine— without any required input from EPA—whether compliance with the RFS would subject small refineries to "disproportionate economic hardship." § 7545(o)(9)(A)(ii). And EPA must consult with DOE and consider its report in adjudicating hardship petitions. § 7545(o)(9)(B)(ii). Given DOE's independent role, and the possibility of "multiple and perhaps conflicting interpretations of the same requirement," *Chevron* does not apply. *DeNaples v. Officer of Comptroller of Currency*, 706 F.3d 481, 488 (D.C. Cir. 2013).

*Third*, "Congress did not intend the EPA's interpretation of 'disproportionate economic hardship' to have the 'force of law.'" *Sinclair Wyoming*, 887 F.3d at 993; *see United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (*Chevron* applies only where "Congress delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority."). Even assuming EPA has authority to issue legislative rules implementing the hardship exemption, it did not invoke that authority here. "Instead, the EPA conducted its interpretation via informal adjudication." *Sinclair Wyoming*, 887 F.3d at 992. And although EPA provided notice and comment here, it "does not generally engage in notice-and-comment practice" when adjudicating hardship petitions. *Mead*, 533 U.S. at 233. Regardless, "the terms of the congressional dele-

gation"—which contemplate individual, case-by-case determinations binding only on the petitioning small refinery, *see* Argument I.E—"give no indication that Congress meant to delegate authority to [EPA] to issue [exemption] rulings with the force of law." *Mead*, 533 U.S. at 231-32.[12]

*Fourth*, if *Chevron* does apply here, then it should be overruled. *See Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. Nov. 10, 2022) (cert. granted). "*Chevron* withdraws a crucial check on the Executive from the separation of powers" and "requires judges to surrender their independent judgment to the will of the Executive." *Baldwin v. United States*, 140 S. Ct. 690, 695 (2020) (Thomas, J., dissenting from denial of certiorari); *see also Buffington v. McDonough*, 143 S. Ct. 14, 22 (2022) (Gorsuch, J., dissenting). This case presents a textbook example of the problem. Deferring to the agency would bless EPA's subversion of the Act, which relied on executive fiat to render congressionally mandated hardship relief a dead letter that no small refinery can ever obtain.

---

[12] In *Hermes*, this Court applied the *Chevron* framework to EPA's interpretation of "disproportionate economic hardship." 787 F.3d at 574. But *Chevron*'s applicability was not disputed in that case, and the Court did not "conside[r] whether *Mead* should control its interpretation of the statute," *Sinclair Wyoming*, 887 F.3d at 998, or this Court's precedents holding that *Chevron* generally does not apply when multiple agencies administer the provision at issue. *Hermes* thus "does not constitute a precedent on" these issues "because it failed to address [them]." *Western Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 951-52 (D.C. Cir. 2021).

At most, therefore, EPA's interpretations deserve deference only to the extent they have "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). And for all the reasons discussed in this brief, they have none. EPA's interpretations are "contrary to the meaning and purpose" of the Act, are based on invalid reasoning, and are inconsistent with both earlier and later agency pronouncements. *Sinclair Wyoming*, 887 F.3d at 999 (vacating denial of hardship petitions under *Skidmore*). The Court should thus decide all interpretive questions in this case de novo.

## II.    EPA's Denials are arbitrary and capricious.

EPA's error-ridden statutory interpretation is not the only problem with the April and June Denials. The Denials are also arbitrary and capricious for multiple reasons. EPA rested its decisions on a new economic theory that runs counter to its own data, as GAO found and EPA itself recently confirmed. EPA relied on unsupported inferences from limited information, armchair economic theorizing, and sheer speculation to make sweeping generalizations about all refineries in all fuel markets. EPA counterfactually assumed that refineries purchase all their RINs ratably, despite EPA's own prior conclusion that this is not always feasible. EPA started with a preordained result of eliminating hardship relief altogether and worked backward to achieve it. And EPA unreasonably dismissed the extensive refinery-specific evidence submitted by Petitioners proving their disproportionate economic hardship. Each of these errors supplies an independent basis for vacatur.

### A.    EPA failed to justify a central assumption of its economic theory.

EPA's RIN cost-passthrough and discount theories both depend on the assumption that "all refineries have equal access to the RINs they need for compliance with the RFS program and *at the same nationwide price*." JA3190 (emphasis added); *see also* JA3158-3159, 3162, 3164-3169 (illustrating passthrough and discount theories based on uniform RIN prices); JA3237 ("RIN prices are uniform across the nation."). If that premise is false—if small refineries in fact pay more for RINs than other obligated parties—then EPA's theories fall apart.

Because this premise was essential to EPA's conclusion that "small refineries do not have disproportionate RFS compliance costs," JA3139, EPA had an affirmative obligation to justify it. *See American Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) ("an agency has the duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule") (cleaned up). But EPA made no effort to support its key assumption that all parties participating in the RIN market pay and receive the same RIN price; it simply asserted that this is so. The agency's "ipse dixit" is no substitute for the "substantial evidence [required] to support a decision." *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020). For this reason alone, EPA's denial decisions are arbitrary and capricious. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir.

2018) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence.").

But EPA also "failed to comply with the [Administrative Procedure Act]" when it "fail[ed] to examine" data in its possession that could have tested whether all parties pay the same price for RINs. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("If an agency fails to examine the relevant data, … it has failed to comply with the [Administrative Procedure Act]."). EPA maintains data about RIN sales transactions, including the prices of RINs traded on the market. *See* 84 Fed. Reg. at 10,604-05; JA3155 n.165. EPA could have used these data to assess whether all parties that comply with the RFS by buying RINs face the same acquisition costs, and commenters urged EPA to do just that. *See* JA1058 (urging EPA to use its RIN data "to demonstrate that obligated parties have similar … costs"). But EPA inexplicably failed to do so. EPA's refusal to "explain [its] … failure to use" relevant data renders its conclusion arbitrary and capricious. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999); *BellSouth Telecomms., Inc. v. FCC*, 469 F.3d 1052, 1060 (D.C. Cir. 2006) (arbitrary and capricious to fail to examine agency-collected data relevant to a gap in the agency's reasoning).

Although agencies always "must examine the relevant data," *State Farm*, 463 U.S. at 43, EPA's failure to do so here was particularly egregious. For one, only EPA could have examined the data, because EPA

alone (not small refineries or other stakeholders) possessed the full set of transaction data required to assess whether all refineries that rely on the RIN market pay the same amount for RINs. When confronted by GAO about its failure to examine the data, EPA tried to pass the responsibility off on small refineries, stating that "if small refineries could not demonstrate that they paid more than larger refineries to purchase RINs, then EPA could assume they do not." JA3470. But as GAO explained, while small refineries know how much they pay for RINs, the prices paid by others "are not publicly available, and therefore EPA cannot expect refineries to be able to analyze these data." JA3470.

Moreover, had EPA examined its pricing data, it would have seen that the data demonstrably refute its "assum[ption] that all parties pay and receive one price for RINs." JA3412. GAO later obtained the full set of data from EPA and used that data to "test whether all parties pay and receive the same price for RINs." JA3412. Contrary to EPA's assumption, GAO "found that companies that tended to trade lower quantities of RINs (likely smaller refineries) were either paying more to buy RINs or receiving less when they sell RINs, relative to larger companies." JA3412. GAO's "finding that small buyers pay more and small sellers receive less" for RINs undercuts EPA's entire economic theory by showing that "the RIN market is not functioning as EPA assumes it is." JA3469.

Following GAO's criticism, EPA itself *confirmed* that its data show that parties do not all pay the same price for RINs. EPA's own belated

analysis shows that small refineries pay up to 7.5% more when buying RINs and receive less when selling them compared to larger competitors. JA3399, 3412. And the averages mask even greater differences for individual refineries: some smaller refineries pay even more and receive even less than others. Congress created hardship relief for exactly this reason, and EPA is relying on a demonstrably false theory about the RIN market to ignore Congress's intent.

## B.    EPA failed to support its RIN cost passthrough theory.

EPA lacked any persuasive support for its sweeping conclusion— which was fundamental to the decisions under review—that "all parties in all markets that sell fuel recover their RIN costs when they sell their fuel." JA3186. As Petitioners' expert economists explained, "EPA's claim that the RFS compliance costs are the same for all obligated parties is implausible," JA1274, and "is not consistent with the empirical results relevant to this issue in the academic literature." JA1047. To the contrary, the "substantial academic literature" on the topic "provides evidence of *imperfect* pass-through." JA1049 (emphasis added); *see also* JA1277-1279 (surveying literature and concluding that it "does not suggest full pass-through of all RINs to all fuels in all locations"). One study, for example, "highlight[s] the heterogeneity in pass-through depending on market size and integration at retail." JA1049. And another "documents the variation in pass-through at gasoline terminals

depending on the number of products offered and the region of the terminal." JA1051.

Even EPA's preferred studies show at most that "price spreads reflect changes in the calculated RIN obligation *on average*." JA1048; *see also* JA3234 (claiming that study is "largely consistent and supportive" of EPA because it found that RIN costs "were fully passed through to wholesale gasoline and diesel prices *on average*" (emphasis added)). But those averages are industry-wide—none of the studies EPA cites looked specifically at small refineries. Moreover, averages say nothing about the *individual* small refineries that were Congress's focus for hardship exemptions. Even if passthrough truly occurred on average, that would not show that it occurs for all refineries, in all markets, at all times, and for all fuels. *See* JA1051 ("[P]ass-through on average can mask local or specific instances where the mechanism does not operate in the same way."). There is thus no basis for EPA's "clai[m] that there is complete and immediate passthrough in all cases in all submarkets." JA1049. In fact, "it is *unlikely* that market participants *in all situations* are able to recover their firm-specific compliance costs." JA1279 (first emphasis added).

Moreover, the principal study on which EPA relied failed to evaluate passthrough in nearly 30 percent of transactions—namely, those that occur on weekends. *See* JA3153 n.156 (citing Knittel et al. (2017)). As Petitioners' expert economists explained, the Knittel study excluded

weekend sales because RIN price quotes are not available on weekends. JA1232. That omission, however, has significant implications for EPA's RIN passthrough theory, *see* JA1233, which depends on the possibility of ratable RIN purchases for weekend sales, *see* JA3236. Without weekend quotes, refiners cannot ratably purchase RINs in conjunction with weekend fuel sales, nor can EPA determine whether such sales pass through RIN costs.

EPA asserts that it does "not see the lack of pricing information for RINs on Saturday or Sunday as fundamentally problematic" because "refineries can buy a volume of RINs at Friday's RIN price" to cover weekend sales, "as Friday's RIN price information is the information that the market has when it finds the appropriate fuel pricing on Saturday and Sunday." JA3236. EPA provides no evidence, however, that weekend prices are set this way. The market may, for example, instead set prices based on projected costs for the following Monday. If those costs were lower than those on Friday, then EPA's proposed strategy would *not* allow a refinery to fully pass through its RIN costs in the price of weekend sales. EPA cannot rely on "sheer speculation" about how fuel markets work. *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

Nor did EPA have an adequate basis for finding passthrough in *all* fuel markets by analyzing just *two* fuel markets. From its examination of fuel and RIN prices in two "larg[e], coastal fuel markets," EPA extrapo-

lated that RIN costs are reflected in the "price of obligated fuel" in fuel markets "across the United States." JA3174; *see also* JA3170-3173 (examining New York and Gulf Coast fuel markets). Attempting to bridge the obvious gap between its two-market study and its nationwide finding, EPA claimed that the "pricing of fuel in smaller markets is commonly indexed to the price" in "large spot markets." JA3174. But the evidence EPA pointed to at most supported an inference that fuel prices of *some* refineries in *some* "local markets" are *sometimes* tied to fuel prices in "larger markets"—most of which EPA had not even studied. JA3173-3174 (discussing "seven major" fuel markets after analyzing just two); *cf. Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 589 (D.C. Cir. 2010) (invalidating agency action based on an "extrapolation" that was "quite a leap"). EPA offered its "expectation" about how "fuels markets across the United States" perform. JA3174; *see also* JA3244. But it made no attempt to reconcile this armchair economics with the empirical literature discussed above showing variation in passthrough depending on factors such as market size and location. *See, e.g.,* ▮▮▮▮▮▮▮▮ (explaining implications for EPA's passthrough theory of lack of spot market in certain geographic areas). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

EPA thus lacks a sufficient basis to conclude that small refineries always and everywhere recover their RIN costs in the price of their fuel. That was GAO's conclusion too. Given the "limitations" of the evidence

on which EPA relied—in particular EPA's unjustified assumption that fuel transactions occur the same way everywhere as in two coastal fuel markets—GAO found that EPA "does not have assurance" that its passthrough theory is valid. JA3414. Without "fully examining and documenting RIN market performance and RIN pass-through in all relevant fuel markets, EPA will continue to make decisions on small refinery exemptions without quality information and, therefore, risks inappropriately denying valid exemption petitions." JA3415.

### C.    EPA failed to support its RIN discount theory.

EPA also failed to support the other pillar of its economic theory that large refineries that blend their way to RFS compliance have no advantage over small refineries that cannot: its conclusion that *all* "blenders pass through *the full value* of the RIN to wholesale purchasers in discounts on the price of the blended fuel they sell." JA3178 (emphasis added). For this blanket finding, EPA pointed to data from just three markets—two of which EPA did not even identify. JA3178-3179. EPA offered no basis for its assumption that its selected markets are representative of every market nationwide. *See Kristin Brooks*, 626 F.3d at 589. Further, EPA acknowledged that some sales contracts permit blending refineries to retain up to 25% of the value of the RIN, refuting EPA's theory that blenders always discount the price of the fuel they sell by the full value of the RIN. JA5885-5886. And as EPA recognized, the posted prices that it used in conducting its analyses do not always reflect

- 70 -

the price that blenders receive. JA5886. EPA failed to explain how these facts could be squared with its categorical RIN discount theory.

### D. EPA's RIN passthrough theory incorrectly—and unreasonably—assumes that refineries purchase all RINs ratably.

EPA acknowledges that, under its theory, refineries will recover their full RIN costs *only if* they "purchase the RINs they need for compliance on a ratable basis." JA3176. But as the record before the agency amply demonstrated, small refineries often do *not* purchase RINs ratably. *See* JA361.n.54; JA747-748; JA861-863. EPA itself has recognized that refineries can and do purchase RINs non-ratably. JA16300 (EPA stating that "[o]bligated parties need not acquire RINs at the same time that they produce or import fuel but may, if they choose, simply purchase the required number of RINs by the end of the compliance period, once their annual production is known"). EPA's theory thus runs directly "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. EPA cannot rationally rely on an economic theory that fails in real-world conditions. *See American Petroleum Inst. v. EPA*, 862 F.3d 50, 68 (D.C. Cir. 2017) (invalidating rule because "EPA fail[ed] to provide sufficient linkage between theory, reality, and the result reached").[13]

---

[13] As discussed above, EPA's contention that small refineries must purchase their RINs ratably for their RIN costs to be caused by RFS compliance rests on a misinterpretation of the statute. *See* Argument I.D. In addition to being factually incorrect, therefore, EPA's passthrough theory

Moreover, small refineries often *cannot* purchase RINs ratably, and therefore cannot pass through their full compliance costs. As commenters told the agency, "[v]arious factors, such as limited or highly variable cash flow and debt covenant requirements, limit small refiners' ability to acquire RINs ratably." JA361 n.54; *see also, e.g.,* ███████████████████ ████████████████████████████████████████████. Indeed, several of the Petitioners would have ████████████████ if they had tried to buy enough RINs even as they experienced disproportionate economic hardship. *E.g.,* ████████████████████████████████████████████████████████ ████████████████████████████████.

EPA dismissed small refineries' cash-flow problems on the ground that "the proceeds from the sale of the fuel can be directly used towards the purchase of the RINs," since "the very concept of ratable RIN purchases means that the acquisition of the RIN is approximately concurrent with the sale of the fuel." JA3260. To begin with, that response is contrary to EPA's assertion that refiners can ratably purchase RINs for weekend sales by pre-purchasing all RINs for those sales on Friday. But more fundamentally, the response ignores EPA's own prior conclusion that "[t]he lack of alignment in time between RIN generation and gasoline/diesel fuel demand renders 'real time' RIN retirement infeasible." 84 Fed. Reg. at 10,616. Proceeds from sales are frequently fully committed

---

is arbitrary and capricious because it relies on a "facto[r] which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

to other uses, such as meeting debt-covenant requirements. And EPA further ignores "differences in timing of pass-through," which "could lead an obligated party to try to ratably comply yet not receive complete pass-through because of fluctuations in RIN or fuel markets over a longer time required for pass-through to occur in certain product or regional markets." JA1056-1057.

EPA's ratable-purchase assumption also unreasonably dismissed "limitations in [small refineries'] ability to buy RINs in the proper lot sizes without facing a much steeper cost to acquire the RINs." JA3260. For example: ███████████████████████████ cannot purchase RINs in amounts small enough to match their daily production volumes. ████████████████████████████████████████ ███████████████████████. These refineries cannot find a trading house that sells RIN bundles of that size, and they do not have the resources for a RIN trading desk to constantly monitor and purchase RINs. ███████.

EPA speculated that small refineries could simply "enter into contracts with various RIN brokers to purchase RINs on a ratable basis." JA3106. But multiple small refineries submitted evidence refuting the availability of RIN contracts, and EPA offers no evidence whatsoever that such contracts are commercially available. If they were, they would only *increase* the cost of acquiring RINs for small refineries, undermining EPA's core premise that all parties face the same RIN acquisition costs.

And EPA again offered nothing but "sheer speculation" that the broker-age fees small refineries would have to pay would be comparable to the administrative costs faced by large refineries that acquire RINs in other ways. *Sorenson Commcn's*, 755 F.3d at 708.

Even if Petitioners could have purchased RINs ratably in 2016-2021, they had good reasons not to. Several Petitioners had consistently received hardship relief in previous years, and they reasonably relied on EPA's then-existing methodology when deciding whether to acquire RINs (if they could even afford them) for the years at issue while their hardship petitions were pending. *See, e.g.*, JA15997-15998 ¶¶ 2, 4; JA16261 ¶ 3; JA16322 ¶ 4; JA16703 ¶ 8; JA15661 ¶ 4; JA10245. Petitioners could not have foreseen that EPA would entirely upend the hardship evaluation process years later. And it would have been nonsensical to buy many millions of dollars of RINs after consistently receiving the exemption when the refineries' burdens from the RFS were only growing more disproportionate.

That alternative—purchasing RINs in case their hardship petitions were denied—would also have exposed Petitioners to significant financial loss. EPA has repeatedly refused to make whole small refineries that had purchased and retired RINs for compliance but then were belatedly granted hardship relief after EPA missed the statutory deadline to decide their petitions. *See, e.g.*, *Kern Oil & Refining Co. v. EPA*, No. 21-71246, 2022 WL 3369528, at *2 (9th Cir. Aug. 16, 2022); *Wynnewood Refining*

*Co. v. EPA*, Nos. 22-60357, 22-60424 (5th Cir. June 24, 2022). Those refineries were left with worthless or substantially devalued RINs, costing them tens of millions of dollars in losses. *Kern Oil*, 2022 WL 3369528, at *3; *see also* JA3426 (describing one small refinery that "lost $16 million" after EPA granted an exemption just "10 business days before the RINs would expire," and another that sold its RINs "for 10 to 15 percent of their original purchase price" after it "received its exemption just a few days before the RINs would expire").

Finally, because RIN prices have skyrocketed since the biofuels associated with 2016-2021 RINs were blended, Petitioners cannot now pass through the new astronomical compliance costs to their past customers. In the real world, then, Petitioners now face disproportionate economic hardship *even under* EPA's new economic theory. It is arbitrary and capricious—and incredibly unfair—for EPA to blame small refineries for unknowingly walking into a trap while EPA was brazenly violating its statutory deadlines and leaving petitions in limbo for years. *See* JA3422 (finding EPA's "routine[ ]" violation of statutory deadlines has "diminish[ed] the benefit of exemptions, create[d] market uncertainty, discourage[d] investment, and undermine[d] the design of the RFS more broadly"). Instead of taking accountability for the ways that its management of the RFS program have negatively affected small refineries, EPA has second-guessed Petitioners' financials and business decisions. EPA argues that small refineries should have purchased RINs

ratably despite their history of exemptions, and it suggests with no support whatsoever that small refineries could have purchased RINs with alleged "revenue" from prior hardship relief. JA16574-16575 ¶¶ 42-44 . But the RFS imposes *additional costs* on small refineries, so hardship relief does not confer a benefit but rather relieves a burden. For Petitioners, hardship relief is not a windfall; it is a lifeline.

### E.    EPA's result was impermissibly preordained.

The record of this proceeding shows that EPA unlawfully started with its preordained result—eliminating hardship relief altogether—and worked backwards to get there. EPA relied on a vacated judgment that has no legal force; failed to meaningfully consult with DOE as the statute requires; and still has not said what criteria it will use to evaluate and decide future hardship petitions. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).

1.    The record abounds with evidence that EPA ran a deliberately faulty process designed to produce its preferred outcome. First, EPA grounded its Denials on the Tenth Circuit's decision in *RFA*, stating that it considers the remaining holdings of *RFA* to "remain in effect." JA3136. EPA attributes its "change in approach" to hardship petitions "primarily" to that decision. JA3137-3138. But the Tenth Circuit "vacated" *RFA* in its entirety on remand "[i]n light of the United States Supreme Court's decision in *HollyFrontier*." *Renewable Fuels Ass'n v. EPA*, 854 F. App'x 983, 984 (10th Cir. 2021) (per curiam); *see RFA*, 2021 WL 8269239, at *1

(10th Cir. July 27, 2021) ("On June 25, 2021, the Supreme Court [ ] entered a judgment reversing the judgment of this court. Accordingly, … the judgment of this court filed January 24, 2020 is vacated.").

*RFA* accordingly has no continuing legal force. It is well settled that vacating a judgment "remove[s] both the *res judicata* and the *stare decisis* effect" of the opinion. *City Ctr. W., LP v. Am. Mod. Home Ins. Co.*, 749 F.3d 912, 913-14 (10th Cir. 2014) (citation omitted). "In essence, when a judgment is vacated all is effectually extinguished." *Falcon v. Gen. Tel. Co.*, 815 F.2d 317, 320 (5th Cir. 1987) (cleaned up). When the Tenth Circuit vacated its judgment in *RFA*, "it swept away all that was tied to that judgment." *Id.*; *City Ctr. W.*, 749 F.3d at 913-14.

Because EPA's actions are "primarily" based upon the mistaken belief that "the remaining holdings of RFA … remain in effect," EPA's decision is unlawful under the *Chenery* mistake-of-law doctrine. *See Teva Pharm. U.S.A. Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (where "FDA mistakenly thought itself bound by our decisions in *Teva I* and *Teva II*," that "error renders its decision arbitrary and capricious" under *Chenery*); *Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169-71 (D.C. Cir. 1986). When an agency makes an error of law—as EPA has here—"the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case to the [agency]." *BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency of U.S.*, 467 F.3d 871, 873-84 (5th Cir. 2006) (cleaned up).

2.    Next, EPA's purported consultation with DOE was a sham. The Act requires EPA to evaluate hardship petitions "in consultation with the Secretary of Energy" and to "consider the findings" of the 2011 DOE Study. § 7545(o)(9)(B)(ii). A consultation obligation requires an agency to give "meaningful consideration" to the consultee's position. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1088 (9th Cir. 2011). And meaningful consultation was especially important here given that EPA has no particular expertise in refinery economics, which is presumably why Congress charged DOE, not EPA, with studying disproportionate economic hardship.

EPA has all but admitted that it did not meaningfully consult with DOE and instead ignored DOE's advice. Specifically, EPA admitted abandoning its past practice of relying on the 2011 DOE Study, the scoring matrix, and DOE's recommendations when evaluating hardship petitions. EPA did not consult DOE's scoring of the 2019 and 2020 petitions subject to the April and June Denials (*see, e.g.*, JA13147; JA13160-13161), and it did not even permit DOE to score the 2021 petitions. *See* JA2937 ("Starting with the process that led to … the April 2022 Denial …, EPA will no longer consult with DOE by requesting that it score individual … petitions using the matrix."); JA3419 (similar). Had EPA actually consulted with DOE and followed its recommendations, EPA would likely have granted most, if not all, of Petitioners' hardship petitions as it had done in previous years.

The Bunker Memorandum, which documents EPA's interactions with DOE, confirms the lack of meaningful consultation. In particular, it reveals that EPA never consulted with DOE regarding the critical question that would determine the fate of every petition: whether EPA's new RIN passthrough theory was actually correct and applicable to each small refinery. Instead, DOE *assumed* the theory was "correct":

> DOE concurs that, *if* EPA's assertion that the cost of compliance is the same whether refineries buy RINs or blend renewable fuel to acquire RINs *is correct*, *and* EPA's assertion that RFS compliance costs are passed through in the price of refined products *is also correct*, [then] refineries would not face a "high[er] cost of compliance relative to the industry average."

JA2937 (emphases added) (quoting DOE 2011 Study, JA15). A consultation requirement requires genuine consultation; EPA may not conduct a thought experiment that simply assumes its core conclusions are correct. *See Cal. Wilderness*, 631 F.3d at 1088.

Moreover, EPA's purported consultation with DOE was partial at best. The Act requires EPA to consult DOE regarding both (1) DOE's findings as to whether RFS "compliance ... would impose a disproportionate economic hardship on small refineries," and (2) "other economic factors." § 7545(o)(9)(B)(ii) (cross-referencing § 7545(o)(9)(A)(ii)). But EPA's alleged consultation with DOE addressed only small refineries' RFS compliance costs and nothing else. *See* JA2936. EPA did not complete the consultation that Congress required.

3.    More evidence of EPA's preordained reasoning can be found in the agency's refusal to provide small refineries with guidance on the criteria that EPA will now use to evaluate hardship petitions. *Suncor Energy (U.S.A.), Inc. v. EPA*, 50 F.4th 1339, 1357 (10th Cir. 2022) (holding that EPA's denial was unlawful where petitioner was "left without clear guidance on what it must do" to qualify for hardship relief). As GAO observed, EPA decided "not … to use" the information that it had required Petitioners to submit in their hardship petitions, and did "not specif[y] exactly what information refineries would need to submit" to qualify for hardship relief. JA3416.

### F.    EPA's denials were counter to the evidence before the agency.

EPA denied Petitioners' hardship petitions based on the *assumption* that it is "unlikely" a small refinery "would face a disproportionate cost of compliance." *See* JA3139-3140. But all the facts that EPA previously relied on to find that Petitioners experience disproportionate economic hardship from the RFS are still true for the years at issue here. EPA either ignored or intentionally misinterpreted this information.

<u>Disproportionate diesel production</u>: Petitioners produce a significantly higher percentage of diesel than gasoline compared to the industry average. *E.g.*, ███████████████████████████████████████

████████████████████████████████████████. For example, ███████

of ███████████████████████████████████ transportation-fuel produc-

tion is diesel, ██████████████████████████████, and ███ or more of the transportation fuel produced by ██████████████████ is diesel. ████████████████████████████████. It is harder to blend renewable fuel into diesel, which is typically blended with 5% or less renewable fuel compared to 10% for gasoline. Those Petitioners are thus forced into the RIN market to comply with the RFS; unlike larger competitors, they cannot blend diesel adequately (or at all) to achieve compliance. That constraint produces a significant disproportionate economic hardship. JA45-46. ██████, for example, which produces ██████ diesel, must purchase ████████ more RINs than the average U.S. refinery. ████████████████.

Regional market rejection of blended fuels: Some Petitioners operate in markets that simply will not purchase blended diesel. Customers in ████████████████████████████████ markets overwhelmingly prefer unblended diesel to biodiesel, either because the latter is unfamiliar or because biodiesel blends may cause drivability issues in cold weather. *E.g.*, ████████████████████████ ██████ ████████████ ██████ ████ ████████████ ████. ████ ████████ customers also prefer unblended diesel. ████████. In ████, where ████████████ is located, 20% biodiesel sells at approximately 10-20 cents/gallon lower than the rack price of unblended diesel, which indicates that the market prefers "neat" diesel over diesel blends. ████████.

Market and regional compliance cost disparities: Many Petitioners must compete against large integrated refiners that benefit from meaningful economies of scale. Large refiners can purchase renewable fuels at a lower cost; utilize their capital and resources to blend, often beyond their volume obligations; and export fuels to reduce their volume obligations. JA10247-10248; *see, e.g.*, JA7705; JA7766 (some large U.S. refiners used exports to reduce their RFS obligations by more than 49% in 2019 and 2020). Petitioners must compete against large refiners without these advantages.



Petitioners ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are prime examples. They operate in ▮▮▮▮▮▮▮▮ and must compete with the largest integrated refiners in the country. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮ operates in a rural area, but a major pipeline allows the large integrated refiners to deliver into its backyard and dominate the market. ▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮ is thus forced to discount its sales price below the pipeline import parity price set by the largest integrated refiners to avoid being driven out of the market. ▮▮▮▮. If ▮▮▮▮ did not discount, then the large integrated refineries have sufficient volume to replace ▮▮▮▮ sales.

▮▮▮▮ is another example. It must compete with large integrated refiners in ▮▮▮▮▮▮▮▮, which can generate excess RINs at a profit. ▮▮▮▮. ▮▮▮ faces higher costs to blend ethanol into its limited gasoline production than its larger ▮▮▮▮ competitors because of trans-

portation costs; its delivered cost for ethanol is about ███████ higher than the price of ethanol in ███████. ████████████████████.

███████—which operates a single, landlocked refinery in ███████ ████████████████—must compete with five large ███████ refiners that control 97% of the state's refining businesses and are in the top ten by size in the U.S. ███████. ████████ position results in tighter margins, limited diversification opportunities, and inability to control margins as a price taker in both markets for raw inputs and wholesale transportation fuel products. ███████.

Geographic disparities: Small refineries also experience increased compliance costs due to their locations. S. Rep. No. 111-45, at 109 (2009); 161 Cong. Rec. H10105 (daily ed. Dec. 17, 2015). ███████, for example, whose refineries sell gasoline and diesel in ████████████, cannot use two common strategies to reduce its RFS burdens: (1) shifting production from diesel and gasoline to unobligated fuels like jet fuel or (2) exporting gasoline and diesel. *E.g.*, ████████████. ███████ refineries produce little to no jet fuel because most of the markets they serve are rural, sparsely populated, and cannot support an airport. ████████████████████████████████████ ████████████. Similarly, while some large U.S. refiners used exports to reduce their RFS obligations by more than 49% in 2019 and 2020, exports from ████████████ were nearly zero. *E.g.*, ████████████.

And yet-another example, ███████ had to either import ethanol or biodiesel or purchase RINs at significant cost because no ethanol was produced in ████, and it had access to only a tiny fraction of the single biodiesel producer's small production. ██████.

███████ landlocked ████████ location in the ██████ petroleum region—without pipeline or port access—prevents ██████ from achieving the RIN cost passthrough. ████████. Because a few large, vertically-integrated refiners hold more than 97% market share, the ████████ fuels markets are significantly more concentrated and less competitive than the country as a whole. ████████. ████████ also incurs a higher cost for its crude oil inputs by relying on local crude, creating tighter margins. ████████. EPA's false assumption that fuel markets are uniform nationwide and competitive enough to perfectly pass through the marginal cost of renewable fuel production ignores these geographic market constraints. ████████.

Pipeline rejection of blended fuels: Many Petitioners depend on pipelines to move their product, and those pipelines limit blended fuel. Unlike large integrated refineries, small refineries lack the resources to acquire blending operations at the other end of the pipeline. ████, for example, must sell wholesale through the ████████████ (████████), which will not accept blended fuel. It is thus impossible for Hunt to blend enough fuel to comply with the RFS (████████), and it must purchase RINs at astronomical cost: ████████████████. ████████.

Because its local market is small, ███████████ must sell approximately
████ of its transportation fuel into larger markets through pipelines that
prohibit blended fuel. ████████████. Pipeline restrictions also prevent
█████████████████████████████████ from shipping blended fuel.
███████.

   RIN "theft": In instances where small refineries are able to produce
some blended fuel, several Petitioners are forced to forfeit the value of
their investments to produce blended fuel through contracts that require
them to discount the blended fuel by the price of the created RIN. *See,
e.g.*, █████████████████████████████████████████████
█████████████████████). If the refineries did not acquiesce to these
demands, they would lose their customers. ██████████████████
█████████████████████████████. EPA argues that Petitioners re-
cover the value of the RIN because they allegedly can sell it. JA3157-
3160. But unlike large integrated refiners, Petitioners cannot recover
revenue from selling extra RINs; they need all of them for RFS compli-
ance (absent an exemption). ██████████.

   Refinery-specific passthrough analyses. Petitioners submitted
detailed economic analyses demonstrating that EPA's theory of complete
RIN cost passthrough was not true for them. █████, for example, submit-
ted a █████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████



\*       \*       \*

All the information described above, which was in the agency record, confirms that EPA's passthrough theory is empirically false in Petitioners' cases. EPA's explanation for its Denials thus runs counter to its own data and the evidence in the record; relies on unsupported and unreasonable generalizations; and shows that the agency began with its desired result and reverse engineered it. EPA's rationale for its massive flip-flop falls far short of the "more detailed justification" that is required in view of Petitioners' serious and reasonable reliance interests on EPA's prior methodology. *Fox Television*, 556 U.S. at 515.

## III. EPA unlawfully applied its new standard retroactively.

Even if EPA's new approach were lawful, EPA cannot apply it to Petitioners' 2016-2021 hardship petitions for two reasons. First, EPA acted unlawfully when it applied a fundamentally new approach *after* the compliance years were over and after Petitioners had prepared and submitted petitions in reliance on the old framework. Second, even if EPA were permitted to apply its new approach retroactively, EPA flagrantly violated statutory deadlines without mitigating the resulting harm.

### A. The April and June Denials are unlawfully retroactive.

A "fundamental principle in our legal system," enshrined in the Due Process Clause, "is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-58 (2012); *see Howmet Corp.*, 614 F.3d 544, 553 (D.C. Cir. 2010) ("Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." (citation omitted)). Notice is fair when it allows regulated parties "to identify, with '*ascertainable certainty*,' the standards with which the agency expects [them] to conform." *Id.* at 553-54 (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)) (emphasis added).

As this Court has recognized, it may sometimes "be necessary to deny retroactive effect" to a new rule "in order to protect the settled expectations of those who had relied on the preexisting rule." *Williams Nat. Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993); *see also DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (when an agency changes course, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account"). In light of these fairness concerns, this Court explained that retroactive application of new rules announced in adjudications is inappropriate in two circumstances: when the agency "substitut[es]" new law for old law that was "reasonably clear," *Williams Nat. Gas*, 3 F.3d at 1554, or when "retrospective application … would work a manifest injustice," *Clark-Cowlitz Joint Operating Agency v. FERC*, 800 F.2d 1074, 1081 (D.C. Cir. 1987).

Under these standards, it was unlawful for EPA to give its April and June Denials retroactive force. Petitioners reasonably relied on EPA's longstanding, prior approach to adjudicating hardship petitions, and EPA's novel approach imposes new, severe, and manifestly unjust consequences on Petitioners' past conduct.

Petitioners submitted all the relevant petitions long before EPA announced its new approach to hardship relief in April 2022. In fact, EPA was statutorily required to have *decided* all of Petitioners' hardship petitions much earlier. § 7545(o)(9)(B)(iii); *see* App'x A. Petitioners' hardship

petitions all conformed to and relied on EPA's "well established practice" of applying the 2011 DOE Study and DOE's scoring matrix. *Cassell v. FCC*, 154 F.3d 478, 486 (D.C. Cir. 1998). Under that framework, Petitioners repeatedly received annual exemptions, and EPA does not attempt to dispute that, had it applied the 2011 DOE Study and scoring matrix here, it would have granted most, if not all, of Petitioners' hardship petitions. Indeed, Petitioners' reasonable reliance on EPA's now-abandoned approach was vindicated by EPA's decision *granting* 31 hardship petitions for 2018 (before later retroactively denying them), and by DOE's scoring of Petitioners' hardship petitions for 2019 and 2020.

By the time EPA announced its new interpretation, Petitioners obviously could not change their conduct for past compliance years. § 7545(o)(2)(B) (compliance year ends December 31). Petitioners reasonably relied on EPA's prior approach to granting hardship relief to determine their compliance (*i.e.*, RIN) strategy, especially given that Petitioners' conditions for compliance had not improved and in many cases had grown worse since the prior years when they had received relief. ███████████████████████████████████████████████████████████ ████████████████████████████████. In reliance on EPA's long-standing approach, some refineries had chosen not to expand production to avoid being disqualified as small refineries. *See, e.g.*, ████████████████████████████.

Moreover, even EPA acknowledged that it would be prohibitively harmful to attempt to enforce compliance for 2016-2018 and accordingly

developed an alternative approach that did not require Petitioners to retire RINs. *See* JA3032-3033. But those same factors—RIN scarcity and the exponentially increased compliance cost caused by EPA's illegal conduct—exist for 2019-2021 as well. EPA itself made similar observations about the dire RIN market in April 2022. JA3032-3033.

As the Fifth Circuit recently observed, small refineries "are entitled to know the ground rules by which EPA will grant or deny their hardship petitions, in advance of making their applications." Fifth Circuit Stay Order 10-11. EPA's belated attempt at "denying the refiners' pending hardship petitions—in many cases for compliance periods now long elapsed—based on its 'new interpretation' … disregarded the refiners' reliance interests, failed to give fair notice, and acted retroactively." *Id.* at 6, 8; *see Retail, Wholesale & Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972) (holding that "the inequity of applying" a new rule "far outweigh[ed] the interests that might be furthered if it were applied"); *McDonald v. Watt*, 653 F.2d 1035, 1044 (5th Cir. 1981) (retroactive application impermissible where regulated party showed reasonable and detrimental reliance, and agency established no compelling interest in retroactive application).[14] EPA's decision to apply its brand

_____

[14] Petitioners Cross Refining and United Refining further contend that EPA improperly acted through adjudication rather than rulemaking. Although that argument is foreclosed by *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), and *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969), Cross Re-

new interpretation retroactively was especially brazen because EPA deprived regulated parties of exemptions years after the fact. *See, e.g.*, *American Methyl Corp. v. EPA*, 749 F.2d 826, 839 (D.C. Cir. 1984) ("[EPA] is without authority to revoke a noncontingent waiver, based on new evidence, nearly two-and-one-half years after its initial approval.").

## B. EPA did not ameliorate the harm that it caused by missing statutory deadlines.

Even if EPA were entitled to retroactively apply a new framework, in the circumstances here, the agency failed to meet its obligation to mitigate the harm from its multiple missed statutory deadlines.

Congress required EPA to decide Petitioners' hardship petitions 90 days after EPA received them. § 7545(o)(9)(B)(iii). But EPA blew past that statutory deadline several times for Petitioners—just as it has blown almost 90% of the deadlines since 2013. JA3422. To take just one example: EPA initially *granted* ████ 2018 petition over nine months late, then later reversed that decision in April 2022, over 29 months late. EPA decided ████ 2019 petition 27 months late and decided the 2020 petition 18 months late. *See* App'x A; *see also* JA3422 (EPA resolved all 2019 hardship petitions "on average, more than 700 days" after receiving them).

---

fining and United Refining respectfully wish to preserve the argument that those cases were wrongly decided.

EPA's Denials violate the settled principle that an agency must adequately account for the harm caused by its failure to meet statutory deadlines. Courts have repeatedly recognized—including in the context of the RFS program specifically—that when an agency like EPA misses statutory deadlines, "basic principles of due process" require EPA in that circumstance to "reasonably consider[ ]" and "minimize the hardship caused to obligated parties by virtue of EPA's delay." *Americans for Clean Energy*, 864 F.3d at 718, 719, 721 (cleaned up).

EPA previously acknowledged that it would be unfair to require 2016-2018 compliance now in light of the problems in the RIN market created by EPA's late action, so EPA provided an alternative method of compliance that did not require Petitioners to retire RINs. *See* JA3032-3034; JA3282-3284.[15] But EPA did not come close to mitigating the harm caused by its delayed action on the 2019–2021 hardship petitions. EPA never faced up to the fact that obligated parties like Petitioners relied to their detriment on EPA's prior methodology. And by changing the methodology after-the-fact, without fair notice and without any way to satisfy EPA's new approach, EPA *exacerbated* the harm from its late decisions.

---

[15] Wynnewood has filed a separate petition challenging EPA's failure to meaningfully redress the harm caused to Wynnewood by EPA's violation of the statutory deadline for the 2018 compliance year. *See* Petition for Review, *Wynnewood Refining Co. v. EPA*, No. 22-60357, Doc. 00516369962 (5th Cir. June 24, 2022).

Making matters worse, EPA compressed many annual compliance deadlines into a very short timeframe while RIN prices are near all-time highs. In February 2022, EPA announced the misnamed "Extension Rule," which compressed the deadlines for *four years' worth* of annual RFS compliance obligations (2019-2022) into just a *nine-month period*. 87 Fed. Reg. 5696.[16] That compression is especially problematic given that the prices for 2021 and subsequent RINs are just as high as the prices for the short supply of 2020 RINs, and those high prices are due to EPA's unlawful actions.[17]

Under these circumstances, the remedy that would actually mitigate the harm caused by EPA's delays for the 2019-2021 compliance years is the one that EPA itself adopted to address its late action on the 2016-2018 petitions.

## IV.  EPA lacks authority to deny "small refinery" status to certain Petitioners contrary to the statutory definition.

EPA denied hardship petitions submitted by two refineries (█████
████████████████████████) for an additional reason: It concluded that they do not qualify as "small refineries" eligible to seek

---

[16] In September 2022, EPA made a slight alteration: small refineries would have to retire RINs for five compliance years (2019-2023) within just 14 months. Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 54,158 (Sept. 2, 2022).

[17] Average prices for 2020-2023 ethanol RINs range from $1.59 to $1.61. OPIS End of Day Ethanol Assessment Report (Feb. 27, 2023).

the hardship exemption. Petitioners ████████████████████ con-
tend that those conclusions were wrong.

### A.   ████████████ing qualifies as a "small refinery."

As one of the country's very smallest refineries, ████ is disadvan-
taged in complying with the RFS program in multiple respects, *see* Argu-
ment II.F, and ought to be the poster child for a hardship exemption.
Instead, EPA determined that ████ is *ineligible to even petition for a
hardship exemption* because ███████████████████████████████
████████████████████████████████████████████████████████████
████, and therefore did not submit a verification letter to EPA. *See*
██████████. That determination violates the Act's plain language and
EPA's regulations; departs without explanation from EPA's prior position
granting ██████████ hardship exemptions; and ignores the exigent
economic circumstances surrounding its decision to ████████████
████████████████████████.

First, EPA's attempt to define eligibility based on what petroleum
products a refinery was manufacturing in 2004 and 2006 violates the Act.
Congress expressly defined a "small refinery" as "a refinery for which the
average aggregated daily crude oil throughput for a calendar year ... does
not exceed 75,000 barrels." § 7545(o)(1)(K). Under that criterion, ████ is
the smallest of the small—for 2018, 2019, and 2020, its average crude

throughput never reached ███ of that threshold.[18] Congress granted the initial exemption to all small refineries categorically: "The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011." § 7545(o)(9)(A). Similarly, Congress conditioned subsequent extensions on small refinery status: "[a] small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship." § 7545(o)(9)(B)(i). Thus, the Act permits only one eligibility test—that small refinery's throughput.

EPA attempts to avoid the Act's plain language by reasoning that its regulations allowed only small refineries that were participating in the transportation fuels market to receive the initial exemption. ████████ ███. If EPA's interpretation of 40 C.F.R. § 80.1141 were justifiable, then the regulation would be contrary to the Act itself and should be set aside. *See Stinson v. United States*, 508 U.S. 36, 38 (1993) (an agency's interpretation of a regulation may not violate a federal statute). But EPA's reading of its regulation is wrong in any case and not entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-18 (2019) (a court will not defer to a new interpretation unless the regulation is actually ambiguous, nor where deference would create unfair surprise to regulated parties).

---

[18] 2018 (5,262 BPCD), 2019 (5,390 BPCD), and 2020 (5,396 BPCD). *See* ████████████████████████████.

EPA's regulation exempts "gasoline produced at a refinery … if that refinery meets the definition of a small refinery under § 80.1401 for calendar year 2006." 40 C.F.R. § 80.1441(a)(1).[19] The regulation goes on to specify that "[t]his exemption shall only apply to refineries that process crude oil through refinery processing units," with no requirement that the refineries produce "gasoline." 40 C.F.R. § 80.1441(a)(4).[20] There is no dispute that Cross has always met the definition of a small refinery under 40 C.F.R. § 80.1101(g), that it still meets it today under 40 C.F.R. § 80.1401, and that it processes crude oil/feedstocks through refinery processing units. Cross thus received the initial exemption, and its business choice not to produce any "gasoline" is irrelevant to its eligibility for subsequent exemptions.

Second, EPA's decision departs without explanation from its past practice of granting ▮▮▮▮ 2018 exemption petition. ▮▮▮▮. An agency must acknowledge where it has changed its position and provide a reasoned explanation for the change. *See Nat'l Ass'n of Home Builders v.*

---

[19] This is consistent with the regulation in 2004 when EPA contends that Cross Refining did not file the necessary paperwork to obtain the exception. *See* 40 C.F.R. § 80.1141(a)(1).

[20] The regulations in 2004 similarly exempted "refineries that process crude oil, or feedstocks derived from crude oil, through refinery processing units." 40 C.F.R. § 80.1141(a)(4).

*EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012). EPA fails entirely to recognize its departure from past practice, let alone explain its departure.[21]

    Third, EPA's purported justification for its eligibility determination for ███ is arbitrary and capricious. In its April and June Denials, EPA

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ ████████ ████████ ██████ ██████████ ████████ ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████.

    But that simply isn't true. ████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████. ███

████████████████████████████████████████████████████████

---

[21] EPA's prior decision granting ██████████████ hardship petition defeats the agency's suggestion (at ████████████████), that ██████ is time-barred under § 7607(b)(2) from challenging its ineligibility determination because it did not previously challenge EPA's regulations. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 523-24 (2014) (recognizing right to bring as-applied challenges to EPA's regulations). Section 7607(b)(2) applies only to specific "[a]ction of the Administrator," and construed narrowly—as all jurisdiction-stripping statutes must be, *INS v. St. Cyr*, 533 U.S. 289, 298 (2001)—it would apply only to a facial challenge to 40 C.F.R. § 80.1141, which is not advanced here.



Treating ▮▮▮ as a "new refinery" ignores the realities of its unique situation both geographically and within the marketplace. It compounds the economic hardship for which ▮▮▮ seeks hardship relief. And it disregards EPA's obligation to individually evaluate each small refinery on a case-by-case basis.

**B.    ▮▮▮▮▮▮▮▮▮▮ refinery is eligible for hardship relief.**

EPA found ▮▮▮▮ ineligible for hardship relief for two reasons. First, because ▮▮▮▮ supposedly "did not receive the initial blanket exemption" that Congress granted to all small refineries. JA3144. Sec-

ond, EPA says ███████ is ineligible for the 2019-2020 compliance years because it "exceeded the 75,000 [barrels-per-day] throughput limit in 2019" when its average throughput is *aggregated* with another nearby refinery's. JA3144. Both conclusions were unlawful.

### 1.   ████████ is eligible for an extension of the exemption provided by Congress.

Congress exempted all small refineries from the RFS until 2011. § 7545(o)(9)(A)(i) ("The requirements ... shall not apply to small refineries until calendar year 2011."). Thereafter, Congress authorized small refineries to apply for individual "extension[s] of the [blanket] exemption" based on disproportionate economic hardship. § 7545(o)(9)(B)(i). The Act defines "small refinery" as "a refinery for which the average aggregate daily crude oil throughput for a calendar year … does not exceed 75,000 barrels." § 7545(o)(1)(K). ███████ throughput was below 75,000 barrels "████████████████████████████████." ██████████████. ███████ thus received the blanket exemption *from Congress*. And EPA twice granted ████████ an annual "extension of the exemption" by approving its petitions for hardship relief. ████████████████.

EPA now claims ███████ is not eligible for a hardship exemption (and never should have been) because it did not receive the blanket exemption *from EPA* by verifying that it met the definition of "small refinery" for "2004 or 2006." JA3142-3144. EPA is wrong for multiple reasons.

- 99 -

First, EPA's look-back to 2004 or 2006 contradicts its own regulations providing that applicants need only "meet the definition of 'small refinery'" for "the most recent full calendar year prior to seeking an extension" "to qualify for an extension." 40 C.F.R. § 80.1441(e)(2)(iii). Nowhere in the Denials does EPA claim to repeal those regulations; EPA twice granted ███████ an exemption under them, ██████████████; and EPA remains bound by them, *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency is not free to ignore or violate its regulations while they remain in effect." (cleaned up)). Second, even if EPA's new eligibility criteria were consistent with its regulations, the agency impermissibly adopted and applied them retroactively. *See* Argument III.A.

Third and most fundamentally, "an agency may not add a new requirement when Congress has specified the criteria." *Medina Tovar v. Zuchowski*, 982 F.3d 631, 635 (9th Cir. 2020) (en banc). Congress granted the blanket exemption to all refineries that were (1) small (2) before 2011. § 7545(o)(9)(A)(i). EPA may not require more. The statute is clear; there is no "ambiguity" that Congress "conferred authority" on EPA "to resolve." *Mead*, 533 U.S. at 229; *see also City of Arlington, Tex. v. FCC*, 569 U.S. 290, 321-22 (2013) (Roberts, C.J., dissenting) ("agency interpretation warrants such deference only if Congress has delegated authority to definitively interpret a particular ambiguity in a particular manner"). Congress set an explicit timing requirement for the blanket exemption:

"until calendar year 2011." EPA cannot rewrite the statute to read "until calendar year 2011 *if a refinery was small in 2004 or 2006.*" *See Utility Air*, 573 U.S. at 327 (EPA lacks "power to revise clear statutory terms.").

> **2.      EPA cannot disqualify ███████████ refinery from small-refinery hardship relief by aggregating its throughput with that of a separate facility.**

███████ crude oil throughput was below the statutory limit of 75,000 barrels per day ("bpd") in 2018-2020, making it a small refinery eligible for 2019 and 2020 hardship relief. ███████. But EPA concluded that ███████ exceeded 75,000 bpd in 2019, and therefore is not a "small refinery," by aggregating its throughput with that of a refinery (formerly ███) that was acquired by ███████ parent company in ███████ ███████. EPA claimed the ███████████████████████ ███████████████████████████████████████ ███████████████████████████████.

EPA's argument strains credulity. The ███████████ refineries are wholly separate facilities: ███████████████████████████ ███████████████████████████████████████ ███████████████. Contrary to EPA's suggestion, nothing about that fundamental separateness changes just because, before the ███ refinery was idled in November 2019, ███████████████ ███████████████████████████████████████ ███████████. One refinery occasionally accepting some material from

another does not remotely ███████████████████████████

███████████████ .

EPA observes that, in certain reports to the Energy Information Administration, the "capacity" and "processed volumes" of the two refineries were combined. But ███████████ decision to cumulatively report "capacity" and "processed volumes" *to the EIA* bears no relation to *the RFS* definition of small refinery, which is based on the crude oil throughput of an individual small refinery without regard to corporate affiliations. There is a separate definition of "small refiner" for the RFS that *does* aggregate the crude-oil throughput of affiliated refineries, 40 C.F.R. § 80.1442(a), but that definition is not at issue here. EIA does not dictate ███████████ status as a small refinery for the RFS.

As a fallback, EPA argues that even if ███████████████ are separate, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ to put ██████████ over the 75,000-barrel-per-day limit. ████████████████████████ . As EPA concedes, however, ██████████ is *not* crude oil. ██████████ . And the Act counts only "crude oil throughput" toward the 75,000 barrel-per-day standard. § 7545(o)(1)(K). EPA's regulations similarly limit RFS "to refineries that process crude oil through refinery processing units," 40 C.F.R. § 80.1441(a)(4), and EPA *removed* an earlier reference to crude-oil-derived "██████████" that had been inconsistent with the statutory text. *See* 40 C.F.R. § 80.1141(a)(4) (2008) (superseded). ██████████████████████

██████ is legally irrelevant to its small-refinery status, and EPA's attempt to disqualify ██████████ based on ████ is just the agency's latest unexplained and unjustified flip-flop.

## CONCLUSION

This Court should vacate the Denials and remand with instructions to reinstate the previously granted 2016-2018 exemptions and evaluate the 2019-2021 petitions under the proper standard. Alternatively, if the Court upholds the Denials (or EPA again denies the petitions on remand), the Court should order EPA to mitigate the harm to Petitioners that EPA caused by so severely violating the statutory decision deadlines.

Dated:  January 9, 2024

/s/ Eric D. McArthur
Eric D. McArthur
Peter C. Whitfield
Daniel J. Feith
Peter A. Bruland
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for Petitioners HF Sinclair Refining & Marketing LLC, HF Sinclair Cheyenne Refining LLC, HF Sinclair Woods Cross Refining LLC, CHS Inc., Delek US Holdings, Inc., Lion Oil Company, LLC, Alon Refining Krotz Springs, Inc., Delek Refining, Ltd., Cenovus Energy Inc., and Superior Refining Company LLC*

/s/ Samuel P. Hershey
Samuel P. Hershey
Thomas E Lauria
Andrew K. Gershenfeld
WHITE & CASE LLP
1221 Ave. of the Americas
New York, NY 10020
(212) 819-2699
sam.hershey@whitecase.com

*Counsel for Petitioner Wynnewood Refining Company, LLC*

Respectfully submitted,

/s/ Jonathan G. Hardin
Jonathan G. Hardin
Alexandra M. Bromer
Michael R. Huston
PERKINS COIE LLP
700 13th St., N.W., Suite 800
Washington, D.C.  20005-3960
(202) 654-6297
JHardin@perkinscoie.com

*Attorneys for Petitioners American Refining Group, Inc., Calumet Montana Refining, LLC, Calumet Shreveport Refining, LLC, Ergon Refining, Inc., Ergon-West Virginia, Inc., Countrymark Refining and Logistics, LLC, Hunt Refining Company, Par Hawaii Refining, LLC, U.S. Oil & Refining Company, Wyoming Refining Company, Placid Refining Company LLC, San Joaquin Refining Co., Inc., and The San Antonio Refinery LLC*

/s/ Ian S. Shelton
Ian S. Shelton
EVERSHEDS SUTHERLAND
(US) LLP
500 Capitol Mall, Suite 1750
Sacramento, California 95814
(916) 245-7427
ianshelton@evershedssutherland.com

*Attorney for Petitioner Kern Oil & Refining Co.*

/s/ Jeffrey R. Holmstead
Jeffrey R. Holmstead
Brittany M. Pemberton
BRACEWELL LLP
2001 M Street N.W., Suite 900
Washington, D.C. 20036
(202) 828-5800
Jeff.Holmstead@bracewell.com

Attorneys for Petitioners Sinclair
Casper Refining Company LLC
and Sinclair Wyoming Refining
Company LLC

/s/ Mark W. DeLaquil
Mark W. DeLaquil
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW
Washington, DC 20036
(202) 861-1527
mdelaquil@bakerlaw.com

Attorney for Petitioners Cross Oil
Refining & Marketing, Inc and
United Refining Company

## APPENDIX A

## Table: Refinery-Specific Petition Information

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| Alon Refining, Krotz Springs Inc. | 2018* | Oct. 26, 2018 JA3524 - 3560 | Jan. 24, 2019 | 1169 |
| | 2019 | Sept. 27, 2019 JA4855 - 4893 | Dec. 26, 2019 | 890 |
| | 2020 | Aug. 4, 2021 JA4894 - 4941 | Nov. 2, 2021 | 213 |
| American Refining Group, Inc. | 2018* | Aug. 10, 2018 JA3569 - 3602 | Nov. 8, 2018 | 1246 |
| | 2019 | Nov. 1, 2019 JA4950 - 4998 | Jan. 30, 2020 | 855 |
| | 2020 | Aug. 5, 2020 JA5008 - 5061 | Nov. 3, 2020 | 577 |
| Calumet Montana Refining, LLC | 2018* | June 29, 2018 JA3610 - 3644 | Sept. 27, 2018 | 1288 |
| | 2019 | Nov. 1, 2019 JA5071 - 5107 | Jan. 30, 2020 | 855 |
| | 2020 | Dec. 18, 2020 JA5111 - 5154 | Mar. 18, 2021 | 442 |
| Calumet Shreveport Refining, LLC | 2018* | Oct. 2, 2018 JA3647 - 3696 | Dec. 31, 2018 | 1193 |
| | 2019 | Dec. 20, 2019 JA5208 - 5261 | Mar. 19, 2020 | 806 |
| | 2020 | Dec. 15, 2020 JA5265 - 5312 | Mar. 15, 2021 | 445 |

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| CHS Inc. | 2018* | Aug. 23, 2018 JA3699 - 3717 | Nov. 21, 2018 | 1233 |
| | 2019 | Nov. 27, 2019 JA5314 - 5334 | Feb. 25, 2020 | 829 |
| | 2020 | Nov. 11, 2020 JA5335 - 5360 | Feb. 9, 2021 | 479 |
| | 2021 | Dec. 7, 2021 JA5361 - 5381 | Mar. 7, 2022 | 88 |
| Countrymark Refining and Logistics, LLC | 2018* | Aug. 3, 2018 JA3719 - 3773 | Nov. 1, 2018 | 1253 |
| | 2019 | Nov. 22, 2019 JA5382 - 5434 | Feb. 20, 2020 | 834 |
| | 2020 | Aug. 10, 2020 JA5438 - 5501 | Nov. 9, 2020 | 571 |
| | 2021 | Sept. 23, 2021 JA5505 - 5608 | Dec. 22, 2021 | 163 |
| Cross Oil Refining and Marketing Inc. | 2018* | July 6, 2018 JA3782 - 3797 | Oct. 4, 2018 | 1281 |
| | 2019 | May 18, 2020 JA5616 - 5634 | Aug. 17, 2020 | 655 |
| | 2020 | May 21, 2021 JA5705 - 5723 | Aug. 19, 2021 | 288 |
| Delek Refining, Ltd. | 2018* | Dec. 31, 2018 JA3802 - 3841 | Apr. 1, 2019 | 1102 |
| | 2019 | Sept. 27, 2019 JA5797 - 5837 | Dec. 26, 2019 | 890 |
| | 2020 | Aug. 4, 2021 JA5838 - 5883 | Nov. 2, 2021 | 213 |

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| Ergon Refining, Inc. | 2018* | Dec. 20, 2018 JA3850 - 3890 | Mar. 20, 2019 | 1114 |
| | 2019 | Dec. 13, 2019 JA5891 - 5939 | Mar. 12, 2020 | 813 |
| | 2020 | Nov. 24, 2020 JA5943 - 5986 | Feb. 22, 2021 | 466 |
| Ergon-West Virginia, Inc. | 2019 | Dec. 31, 2019 JA5993 - 6044 | Mar. 30, 2020 | 795 |
| | 2020 | Dec. 4, 2020 JA6048 - 6092 | Mar. 4, 2021 | 456 |
| HollyFrontier Refining and Marketing LLC (Cheyenne) | 2016* | Mar. 10, 2017 JA6099 - 6121 | June 8, 2017 | 1821 |
| | 2018* | Jan. 31, 2019 JA3895 - 3918 | May 1, 2019 | 1072 |
| | 2019 | Aug. 14, 2020 JA6122 - 6144 | Nov. 12, 2020 | 568 |
| | 2020 | Sept. 21, 2021 JA6145 - 6373 | Dec. 20, 2021 | 165 |
| HollyFrontier Refining and Marketing LLC (Woods Cross) | 2016* | Sept. 12, 2017 JA6374 - 6390 | Dec. 11, 2017 | 1635 |
| | 2018* | Jan. 31, 2019 JA3920 - 3940 | May 1, 2019 | 1072 |
| | 2019 | Sept. 16, 2020 JA6391 - 6411 | Dec. 15, 2020 | 535 |
| | 2020 | Oct. 22, 2021 JA6412 - 6629 | Jan. 20, 2022 | 134 |
| Hunt Refining Co. | 2018* | Aug. 10, 2018 JA3942 - 3981 | Nov. 8, 2018 | 1246 |

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| | 2019 | Oct. 23, 2019 JA6630 - 6678 | Jan. 21, 2020 | 864 |
| | 2020 | May 9, 2020 JA6682 - 6763 | Aug. 7, 2020 | 655 |
| | 2021 | July 20, 2021 JA6767 - 6876 | Oct. 18, 2021 | 228 |
| Kern Oil & Refining Co. | 2018* | Dec. 4, 2018 JA3992 - 4057 | Mar. 4, 2019 | 1130 |
| | 2019 | Oct. 4, 2019 JA6886 - 6951 | Jan. 2, 2020 | 883 |
| | 2020 | Oct. 30, 2020 JA6952 - 7018 | Jan. 28, 2021 | 491 |
| Lion Oil Co., LLC | 2018* | Oct. 22, 2018 JA4064 - 4110 | Jan. 22, 2019 | 1171 |
| | 2019 | Sept. 27, 2019 JA7024 - 7066 | Dec. 26, 2019 | 890 |
| | 2020 | Aug. 4, 2021 JA7067 - 7118 | Nov. 2, 2021 | 213 |
| Par Hawaii Refining, LLC | 2018* | Aug. 10, 2018 JA4119 - 4159 | Nov. 8, 2018 | 1246 |
| | 2019 | Dec. 6, 2019 JA7126 - 7182 | Mar. 5, 2020 | 820 |
| | 2020 | Oct. 30, 2020 JA7186 - 7241 | Jan. 28, 2021 | 491 |
| Placid Refining Co. LLC | 2018* | Aug. 31, 2018 JA4165 - 4202 | Nov. 29, 2018 | 1225 |
| | 2019 | Nov. 18, 2019 JA7248 - 7311 | Feb. 18, 2020 | 837 |

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| | 2020 | Aug. 24, 2020 JA7315 - 7402 | Nov. 23, 2020 | 557 |
| San Joaquin Refining, Inc. | 2018* | Dec. 17, 2018 JA4211 - 4363 | Mar. 18, 2019 | 1116 |
| | 2019* | Jan. 13, 2020 JA7410 - 7542 | Apr. 13, 2020 | 781 |
| | 2020 | Feb. 17, 2021 JA7543 - 7682 | May 18, 2021 | 442 |
| Sinclair Casper Refining Co. LLC | 2018* | Dec. 21, 2018 JA4366 - 4425 | Mar. 21, 2019 | 1113 |
| | 2019* | Oct. 13, 2020 JA7684 - 7740 | Jan. 11, 2021 | 508 |
| | 2020 | Aug. 18, 2021 JA7741 - 7822 | Nov. 16, 2021 | 199 |
| Sinclair Wyo-ming Refining Co. LLC | 2018* | Dec. 21, 2018 JA4437 - 4497 | Mar. 21, 2019 | 1113 |
| | 2019* | Oct. 13, 2020 JA7837 - 7907 | Jan. 11, 2021 | 508 |
| | 2020 | Aug. 18, 2021 JA7908 - 7992 | Nov. 16, 2021 | 199 |
| Superior Refin-ing Co. LLC | 2018* | Dec. 20, 2018 JA4509 - 4560 | Mar. 20, 2019 | 1114 |
| The San Anto-nio Refinery LLC (Calumet San Antonio Re-fining, LLC) | 2019 | Dec. 9, 2019 JA5156 - 5203 | Mar. 9, 2020 | 816 |
| | 2020 | Nov. 23, 2020 JA8007 - 8116 | Feb. 22, 2021 | 466 |
| | 2021 | Nov. 23, 2021 JA8117 - 8172 | Feb. 22, 2022 | 101 |

| Small Refinery | Petition Year * | Petition Submission | 90-Day EPA Deadline | Days Late |
|---|---|---|---|---|
| U.S. Oil & Refining Co. | 2018* | Aug. 10, 2018 JA4562 - 4604 | Nov. 8, 2018 | 1246 |
| | 2019 | Dec. 19, 2019 JA8177 - 8232 | Mar. 18, 2020 | 807 |
| | 2020 | Oct. 30, 2020 JA8235 - 8290 | Jan. 28, 2021 | 491 |
| United Refining Co. | 2018* | Mar. 11, 2019 JA4609 - 4753 | June 10, 2019 | 1032 |
| | 2020 | Sept. 7, 2021 JA8294 - 8428 | Dec. 6, 2021 | 179 |
| Wynnewood Refining Co., LLC | 2017* | Jan. 23, 2018 JA8430 - 8458 | Apr. 23, 2018 | 1502 |
| | 2018* | Sept. 18, 2018 JA4756 - 4789 | Dec. 17, 2018 | 1207 |
| | 2019 | Sept. 20, 2019 JA8459 - 8491 | Dec. 19, 2019 | 897 |
| | 2020 | Dec. 6, 2020 JA8495 - 8536 | Mar. 8, 2021 | 452 |
| | 2021 | Sept. 23, 2021 JA8540 - 8584 | Dec. 22, 2021 | 163 |
| Wyoming Refining Co. | 2018* | Oct. 9, 2018 JA4800 - 4837 | Jan. 7, 2019 | 1186 |
| | 2019 | Dec. 11, 2019 JA8594 - 8651 | Mar. 10, 2020 | 815 |
| | 2020 | Oct. 30, 2020 JA8655 - 8709 | Jan. 28, 2021 | 491 |

*2016, 2017, 2018, and some 2019 petitions originally granted

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains 23,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Century Schoolbook).

Date: January 9, 2024                    */s/ Jonathan G. Hardin*
                                         Jonathan G. Hardin

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2024, I electronically filed the foregoing brief under seal with the Clerk of the Court for the United States Court of Appeals by using the CM/ECF system. I further certify that an electronic copy of the sealed Brief will provided to Respondent's counsel via electronic means.

Date: January 9, 2024                    */s/ Jonathan G. Hardin*
                                          Jonathan G. Hardin

# STATUTORY ADDENDUM

# ADDENDUM

## TABLE OF CONTENTS

Page

42 U.S.C. § 7545(*o*)................................................................Add. 1

**(iv)** As used in this subparagraph, the term distribution capacity includes capacity for transportation, storage, and blending.

**(4) Fuel dispensing systems**

Any person selling oxygenated gasoline at retail pursuant to this subsection shall be required under regulations promulgated by the Administrator to label the fuel dispensing system with a notice that the gasoline is oxygenated and will reduce the carbon monoxide emissions from the motor vehicle.

**(5) Guidelines for credit**

The Administrator shall promulgate guidelines, within 9 months after November 15, 1990, allowing the use of marketable oxygen credits from gasolines during that portion of the year specified in paragraph (2) with higher oxygen content than required to offset the sale or use of gasoline with a lower oxygen content than required. No credits may be transferred between nonattainment areas.

**(6) Attainment areas**

Nothing in this subsection shall be interpreted as requiring an oxygenated gasoline program in an area which is in attainment for carbon monoxide, except that in a carbon monoxide nonattainment area which is redesignated as attainment for carbon monoxide, the requirements of this subsection shall remain in effect to the extent such program is necessary to maintain such standard thereafter in the area.

**(7) Failure to attain CO standard**

If the Administrator determines under section 7512(b)(2) of this title that the national primary ambient air quality standard for carbon monoxide has not been attained in a Serious Area by the applicable attainment date, the State shall submit a plan revision for the area within 9 months after the date of such determination. The plan revision shall provide that the minimum oxygen content of gasoline referred to in paragraph (2) shall be 3.1 percent by weight unless such requirement is waived in accordance with the provisions of this subsection.

**(n) Prohibition on leaded gasoline for highway use**

After December 31, 1995, it shall be unlawful for any person to sell, offer for sale, supply, offer for supply, dispense, transport, or introduce into commerce, for use as fuel in any motor vehicle (as defined in section 7554(2) [7] of this title) any gasoline which contains lead or lead additives.

**(o) Renewable fuel program**

**(1) Definitions**

In this section:

Add. 001

**(A) Additional renewable fuel**

The term "additional renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in home heating oil or jet fuel.

**(B) Advanced biofuel**

**(i) In general**

The term "advanced biofuel" means renewable fuel, other than ethanol derived from corn starch, that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than baseline lifecycle greenhouse gas emissions.

**(ii) Inclusions**

The types of fuels eligible for consideration as "advanced biofuel" may include any of the following:

**(I)** Ethanol derived from cellulose, hemicellulose, or lignin.

**(II)** Ethanol derived from sugar or starch (other than corn starch).

**(III)** Ethanol derived from waste material, including crop residue, other vegetative waste material, animal waste, and food waste and yard waste.

**(IV)** Biomass-based diesel.

**(V)** Biogas (including landfill gas and sewage waste treatment gas) produced through the conversion of organic matter from renewable biomass.

**(VI)** Butanol or other alcohols produced through the conversion of organic matter from renewable biomass.

**(VII)** Other fuel derived from cellulosic biomass.

**(C) Baseline lifecycle greenhouse gas emissions**

The term "baseline lifecycle greenhouse gas emissions" means the average lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, for gasoline or diesel (whichever is being replaced by the renewable fuel) sold or distributed as transportation fuel in 2005.

**(D) Biomass-based diesel**

Add. 002

The term "biomass-based diesel" means renewable fuel that is biodiesel as defined in section 13220(f) of this title and that has lifecycle greenhouse gas emissions, as determined by the Administrator, after notice and opportunity for comment, that are at least 50 percent less than the baseline lifecycle greenhouse gas emissions. Notwithstanding the preceding sentence, renewable fuel derived from co-processing biomass with a petroleum feedstock shall be advanced biofuel if it meets the requirements of subparagraph (B), but is not biomass-based diesel.

**(E) Cellulosic biofuel**

The term "cellulosic biofuel" means renewable fuel derived from any cellulose, hemicellulose, or lignin that is derived from renewable biomass and that has lifecycle greenhouse gas emissions, as determined by the Administrator, that are at least 60 percent less than the baseline lifecycle greenhouse gas emissions.

**(F) Conventional biofuel**

The term "conventional biofuel" means renewable fuel that is ethanol derived from corn starch.

**(G) Greenhouse gas**

The term "greenhouse gas" means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons,[8] sulfur hexafluoride. The Administrator may include any other anthropogenically-emitted gas that is determined by the Administrator, after notice and comment, to contribute to global warming.

**(H) Lifecycle greenhouse gas emissions**

The term "lifecycle greenhouse gas emissions" means the aggregate quantity of greenhouse gas emissions (including direct emissions and significant indirect emissions such as significant emissions from land use changes), as determined by the Administrator, related to the full fuel lifecycle, including all stages of fuel and feedstock production and distribution, from feedstock generation or extraction through the distribution and delivery and use of the finished fuel to the ultimate consumer, where the mass values for all greenhouse gases are adjusted to account for their relative global warming potential.

**(I) Renewable biomass**

The term "renewable biomass" means each of the following:

**(i)** Planted crops and crop residue harvested from agricultural land cleared or cultivated at any time prior to December 19, 2007, that is either actively managed or fallow, and nonforested.

**(ii)** Planted trees and tree residue from actively managed tree plantations on non-federal[9] land cleared at any time prior to December 19, 2007, including land belonging to an Indian tribe or an Indian individual, that is held in trust by the United States or subject to a restriction against alienation imposed by the United States.

**(iii)** Animal waste material and animal byproducts.

Add. 003

**(iv)** Slash and pre-commercial thinnings that are from non-federal [9] forestlands, including forestlands belonging to an Indian tribe or an Indian individual, that are held in trust by the United States or subject to a restriction against alienation imposed by the United States, but not forests or forestlands that are ecological communities with a global or State ranking of critically imperiled, imperiled, or rare pursuant to a State Natural Heritage Program, old growth forest, or late successional forest.

**(v)** Biomass obtained from the immediate vicinity of buildings and other areas regularly occupied by people, or of public infrastructure, at risk from wildfire.

**(vi)** Algae.

**(vii)** Separated yard waste or food waste, including recycled cooking and trap grease.

**(J) Renewable fuel**

The term "renewable fuel" means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel.

**(K) Small refinery**

The term "small refinery" means a refinery for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels.

**(L) Transportation fuel**

The term "transportation fuel" means fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except for ocean-going vessels).

**(2) Renewable fuel program**

**(A) Regulations**

**(i) In general**

Not later than 1 year after August 8, 2005, the Administrator shall promulgate regulations to ensure that gasoline sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains the applicable volume of renewable fuel determined in accordance with subparagraph (B). Not later than 1 year after December 19, 2007, the Administrator shall revise the regulations under this paragraph to ensure that transportation fuel sold or introduced into commerce in the United States (except in noncontiguous States or territories), on an annual average basis, contains at least the applicable volume of renewable fuel, advanced biofuel,

cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B) and, in the case of any such renewable fuel produced from new facilities that commence construction after December 19, 2007, achieves at least a 20 percent reduction in lifecycle greenhouse gas emissions compared to baseline lifecycle greenhouse gas emissions.

**(ii) Noncontiguous State opt-in**

**(I) In general**

On the petition of a noncontiguous State or territory, the Administrator may allow the renewable fuel program established under this subsection to apply in the noncontiguous State or territory at the same time or any time after the Administrator promulgates regulations under this subparagraph.

**(II) Other actions**

In carrying out this clause, the Administrator may--

**(aa)** issue or revise regulations under this paragraph;

**(bb)** establish applicable percentages under paragraph (3);

**(cc)** provide for the generation of credits under paragraph (5); and

**(dd)** take such other actions as are necessary to allow for the application of the renewable fuels program in a noncontiguous State or territory.

**(iii) Provisions of regulations**

Regardless of the date of promulgation, the regulations promulgated under clause (i)--

**(I)** shall contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements of this paragraph are met; but

**(II)** shall not--

**(aa)** restrict geographic areas in which renewable fuel may be used; or

**(bb)** impose any per-gallon obligation for the use of renewable fuel.

**(iv) Requirement in case of failure to promulgate regulations**

If the Administrator does not promulgate regulations under clause (i), the percentage of renewable fuel in gasoline sold or dispensed to consumers in the United States, on a volume basis, shall be 2.78 percent for calendar year 2006.

**(B) Applicable volumes**

**(i) Calendar years after 2005**

**(I) Renewable fuel**

For the purpose of subparagraph (A), the applicable volume of renewable fuel for the calendar years 2006 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of renewable fuel (in billions of gallons): |
|---|---|
| 2006 | 4.0 |
| 2007 | 4.7 |
| 2008 | 9.0 |
| 2009 | 11.1 |
| 2010 | 12.95 |
| 2011 | 13.95 |
| 2012 | 15.2 |
| 2013 | 16.55 |
| 2014 | 18.15 |
| 2015 | 20.5 |
| 2016 | 22.25 |
| 2017 | 24.0 |
| 2018 | 26.0 |
| 2019 | 28.0 |

Add. 006

| | |
|---|---|
| 2020 | 30.0 |
| 2021 | 33.0 |
| 2022 | 36.0 |

**(II) Advanced biofuel**

For the purpose of subparagraph (A), of the volume of renewable fuel required under subclause (I), the applicable volume of advanced biofuel for the calendar years 2009 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of advanced biofuel (in billions of gallons): |
|---|---|
| 2009 | 0.6 |
| 2010 | 0.95 |
| 2011 | 1.35 |
| 2012 | 2.0 |
| 2013 | 2.75 |
| 2014 | 3.75 |
| 2015 | 5.5 |
| 2016 | 7.25 |
| 2017 | 9.0 |
| 2018 | 11.0 |
| 2019 | 13.0 |
| 2020 | 15.0 |
| 2021 | 18.0 |
| 2022 | 21.0 |

**(III) Cellulosic biofuel**

Add. 007

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of cellulosic biofuel for the calendar years 2010 through 2022 shall be determined in accordance with the following table:

| Calendar year: | Applicable volume of cellulosic biofuel (in billions of gallons): |
|---|---|
| 2010.......................................................................................... | 0.1 |
| 2011.......................................................................................... | 0.25 |
| 2012.......................................................................................... | 0.5 |
| 2013.......................................................................................... | 1.0 |
| 2014.......................................................................................... | 1.75 |
| 2015.......................................................................................... | 3.0 |
| 2016.......................................................................................... | 4.25 |
| 2017.......................................................................................... | 5.5 |
| 2018.......................................................................................... | 7.0 |
| 2019.......................................................................................... | 8.5 |
| 2020.......................................................................................... | 10.5 |
| 2021.......................................................................................... | 13.5 |
| 2022.......................................................................................... | 16.0 |

**(IV) Biomass-based diesel**

For the purpose of subparagraph (A), of the volume of advanced biofuel required under subclause (II), the applicable volume of biomass-based diesel for the calendar years 2009 through 2012 shall be determined in accordance with the following table:

| | Applicable volume of biomass- |
|---|---|

| Calendar year: | based diesel (in billions of gallons): |
| --- | --- |
| 2009............................................................................................................................... | 0.5 |
| 2010............................................................................................................................... | 0.65 |
| 2011............................................................................................................................... | 0.80 |
| 2012............................................................................................................................... | 1.0 |

**(ii) Other calendar years**

For the purposes of subparagraph (A), the applicable volumes of each fuel specified in the tables in clause (i) for calendar years after the calendar years specified in the tables shall be determined by the Administrator, in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program during calendar years specified in the tables, and an analysis of--

**(I)** the impact of the production and use of renewable fuels on the environment, including on air quality, climate change, conversion of wetlands, ecosystems, wildlife habitat, water quality, and water supply;

**(II)** the impact of renewable fuels on the energy security of the United States;

**(III)** the expected annual rate of future commercial production of renewable fuels, including advanced biofuels in each category (cellulosic biofuel and biomass-based diesel);

**(IV)** the impact of renewable fuels on the infrastructure of the United States, including deliverability of materials, goods, and products other than renewable fuel, and the sufficiency of infrastructure to deliver and use renewable fuel;

**(V)** the impact of the use of renewable fuels on the cost to consumers of transportation fuel and on the cost to transport goods; and

**(VI)** the impact of the use of renewable fuels on other factors, including job creation, the price and supply of agricultural commodities, rural economic development, and food prices.

The Administrator shall promulgate rules establishing the applicable volumes under this clause no later than 14 months before the first year for which such applicable volume will apply.

**(iii) Applicable volume of advanced biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of advanced biofuel shall be at least the same percentage of the applicable volume of renewable fuel as in calendar year 2022.

Add. 009

**(iv) Applicable volume of cellulosic biofuel**

For the purpose of making the determinations in clause (ii), for each calendar year, the applicable volume of cellulosic biofuel established by the Administrator shall be based on the assumption that the Administrator will not need to issue a waiver for such years under paragraph (7)(D).

**(v) Minimum applicable volume of biomass-based diesel**

For the purpose of making the determinations in clause (ii), the applicable volume of biomass-based diesel shall not be less than the applicable volume listed in clause (i)(IV) for calendar year 2012.

## (3) Applicable percentages

### (A) Provision of estimate of volumes of gasoline sales

Not later than October 31 of each of calendar years 2005 through 2021, the Administrator of the Energy Information Administration shall provide to the Administrator of the Environmental Protection Agency an estimate, with respect to the following calendar year, of the volumes of transportation fuel, biomass-based diesel, and cellulosic biofuel projected to be sold or introduced into commerce in the United States.

### (B) Determination of applicable percentages

#### (i) In general

Not later than November 30 of each of calendar years 2005 through 2021, based on the estimate provided under subparagraph (A), the Administrator of the Environmental Protection Agency shall determine and publish in the Federal Register, with respect to the following calendar year, the renewable fuel obligation that ensures that the requirements of paragraph (2) are met.

#### (ii) Required elements

The renewable fuel obligation determined for a calendar year under clause (i) shall--

**(I)** be applicable to refineries, blenders, and importers, as appropriate;

**(II)** be expressed in terms of a volume percentage of transportation fuel sold or introduced into commerce in the United States; and

**(III)** subject to subparagraph (C)(i), consist of a single applicable percentage that applies to all categories of persons specified in subclause (I).

Add. 010

**(C) Adjustments**

In determining the applicable percentage for a calendar year, the Administrator shall make adjustments--

**(i)** to prevent the imposition of redundant obligations on any person specified in subparagraph (B)(ii)(I); and

**(ii)** to account for the use of renewable fuel during the previous calendar year by small refineries that are exempt under paragraph (9).

**(4) Modification of greenhouse gas reduction percentages**

**(A) In general**

The Administrator may, in the regulations under the last sentence of paragraph (2)(A)(i), adjust the 20 percent, 50 percent, and 60 percent reductions in lifecycle greenhouse gas emissions specified in paragraphs (2)(A)(i) (relating to renewable fuel), (1)(D) (relating to biomass-based diesel), (1)(B)(i) (relating to advanced biofuel), and (1)(E) (relating to cellulosic biofuel) to a lower percentage. For the 50 and 60 percent reductions, the Administrator may make such an adjustment only if he determines that generally such reduction is not commercially feasible for fuels made using a variety of feedstocks, technologies, and processes to meet the applicable reduction.

**(B) Amount of adjustment**

In promulgating regulations under this paragraph, the specified 50 percent reduction in greenhouse gas emissions from advanced biofuel and in biomass-based diesel may not be reduced below 40 percent. The specified 20 percent reduction in greenhouse gas emissions from renewable fuel may not be reduced below 10 percent, and the specified 60 percent reduction in greenhouse gas emissions from cellulosic biofuel may not be reduced below 50 percent.

**(C) Adjusted reduction levels**

An adjustment under this paragraph to a percent less than the specified 20 percent greenhouse gas reduction for renewable fuel shall be the minimum possible adjustment, and the adjusted greenhouse gas reduction shall be established by the Administrator at the maximum achievable level, taking cost in consideration, for natural gas fired corn-based ethanol plants, allowing for the use of a variety of technologies and processes. An adjustment in the 50 or 60 percent greenhouse gas levels shall be the minimum possible adjustment for the fuel or fuels concerned, and the adjusted greenhouse gas reduction shall be established at the maximum achievable level, taking cost in consideration, allowing for the use of a variety of feedstocks, technologies, and processes.

**(D) 5-year review**

Whenever the Administrator makes any adjustment under this paragraph, not later than 5 years thereafter he shall review and revise (based upon the same criteria and standards as required for the initial adjustment) the regulations establishing the adjusted level.

Add. 011

**(E) Subsequent adjustments**

After the Administrator has promulgated a final rule under the last sentence of paragraph (2)(A)(i) with respect to the method of determining lifecycle greenhouse gas emissions, except as provided in subparagraph (D), the Administrator may not adjust the percent greenhouse gas reduction levels unless he determines that there has been a significant change in the analytical methodology used for determining the lifecycle greenhouse gas emissions. If he makes such determination, he may adjust the 20, 50, or 60 percent reduction levels through rulemaking using the criteria and standards set forth in this paragraph.

**(F) Limit on upward adjustments**

If, under subparagraph (D) or (E), the Administrator revises a percent level adjusted as provided in subparagraphs (A), (B), and (C) to a higher percent, such higher percent may not exceed the applicable percent specified in paragraph (2)(A)(i), (1)(D), (1)(B)(i), or (1)(E).

**(G) Applicability of adjustments**

If the Administrator adjusts, or revises, a percent level referred to in this paragraph or makes a change in the analytical methodology used for determining the lifecycle greenhouse gas emissions, such adjustment, revision, or change (or any combination thereof) shall only apply to renewable fuel from new facilities that commence construction after the effective date of such adjustment, revision, or change.

**(5) Credit program**

**(A) In general**

The regulations promulgated under paragraph (2)(A) shall provide--

**(i)** for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required under paragraph (2);

**(ii)** for the generation of an appropriate amount of credits for biodiesel; and

**(iii)** for the generation of credits by small refineries in accordance with paragraph (9)(C).

**(B) Use of credits**

A person that generates credits under subparagraph (A) may use the credits, or transfer all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(C) Duration of credits**

A credit generated under this paragraph shall be valid to show compliance for the 12 months as of the date of generation.

**(D) Inability to generate or purchase sufficient credits**

The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet the requirements of paragraph (2) to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created--

**(i)** achieves compliance with the renewable fuel requirement under paragraph (2); and

**(ii)** generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

**(E) Credits for additional renewable fuel**

The Administrator may issue regulations providing: (i) for the generation of an appropriate amount of credits by any person that refines, blends, or imports additional renewable fuels specified by the Administrator; and (ii) for the use of such credits by the generator, or the transfer of all or a portion of the credits to another person, for the purpose of complying with paragraph (2).

**(6) Seasonal variations in renewable fuel use**

**(A) Study**

For each of calendar years 2006 through 2012, the Administrator of the Energy Information Administration shall conduct a study of renewable fuel blending to determine whether there are excessive seasonal variations in the use of renewable fuel.

**(B) Regulation of excessive seasonal variations**

If, for any calendar year, the Administrator of the Energy Information Administration, based on the study under subparagraph (A), makes the determinations specified in subparagraph (C), the Administrator of the Environmental Protection Agency shall promulgate regulations to ensure that 25 percent or more of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) is used during each of the 2 periods specified in subparagraph (D) of each subsequent calendar year.

**(C) Determinations**

The determinations referred to in subparagraph (B) are that--

**(i)** less than 25 percent of the quantity of renewable fuel necessary to meet the requirements of paragraph (2) has been used during 1 of the 2 periods specified in subparagraph (D) of the calendar year;

**(ii)** a pattern of excessive seasonal variation described in clause (i) will continue in subsequent calendar years; and

Add. 013

**(iii)** promulgating regulations or other requirements to impose a 25 percent or more seasonal use of renewable fuels will not prevent or interfere with the attainment of national ambient air quality standards or significantly increase the price of motor fuels to the consumer.

**(D) Periods**

The 2 periods referred to in this paragraph are--

**(i)** April through September; and

**(ii)** January through March and October through December.

**(E) Exclusion**

Renewable fuel blended or consumed in calendar year 2006 in a State that has received a waiver under section 7543(b) of this title shall not be included in the study under subparagraph (A).

**(F) State exemption from seasonality requirements**

Notwithstanding any other provision of law, the seasonality requirement relating to renewable fuel use established by this paragraph shall not apply to any State that has received a waiver under section 7543(b) of this title or any State dependent on refineries in such State for gasoline supplies.

**(7) Waivers**

**(A) In general**

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2)--

**(i)** based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

**(ii)** based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

**(B) Petitions for waivers**

Add. 014

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, shall approve or disapprove a petition for a waiver of the requirements of paragraph (2) within 90 days after the date on which the petition is received by the Administrator.

**(C) Termination of waivers**

A waiver granted under subparagraph (A) shall terminate after 1 year, but may be renewed by the Administrator after consultation with the Secretary of Agriculture and the Secretary of Energy.

**(D) Cellulosic biofuel**

**(i)** For any calendar year for which the projected volume of cellulosic biofuel production is less than the minimum applicable volume established under paragraph (2)(B), as determined by the Administrator based on the estimate provided under paragraph (3)(A), not later than November 30 of the preceding calendar year, the Administrator shall reduce the applicable volume of cellulosic biofuel required under paragraph (2)(B) to the projected volume available during that calendar year. For any calendar year in which the Administrator makes such a reduction, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(ii)** Whenever the Administrator reduces the minimum cellulosic biofuel volume under this subparagraph, the Administrator shall make available for sale cellulosic biofuel credits at the higher of $0.25 per gallon or the amount by which $3.00 per gallon exceeds the average wholesale price of a gallon of gasoline in the United States. Such amounts shall be adjusted for inflation by the Administrator for years after 2008.

**(iii)** Eighteen months after December 19, 2007, the Administrator shall promulgate regulations to govern the issuance of credits under this subparagraph. The regulations shall set forth the method for determining the exact price of credits in the event of a waiver. The price of such credits shall not be changed more frequently than once each quarter. These regulations shall include such provisions, including limiting the credits' uses and useful life, as the Administrator deems appropriate to assist market liquidity and transparency, to provide appropriate certainty for regulated entities and renewable fuel producers, and to limit any potential misuse of cellulosic biofuel credits to reduce the use of other renewable fuels, and for such other purposes as the Administrator determines will help achieve the goals of this subsection. The regulations shall limit the number of cellulosic biofuel credits for any calendar year to the minimum applicable volume (as reduced under this subparagraph) of cellulosic biofuel for that year.

**(E) Biomass-based diesel**

**(i) Market evaluation**

The Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall periodically evaluate the impact of the biomass-based diesel requirements established under this paragraph on the price of diesel fuel.

**(ii) Waiver**

Add. 015

If the Administrator determines that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, shall issue an order to reduce, for up to a 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed 15 percent of the applicable annual requirement for biomass-based diesel. For any calendar year in which the Administrator makes a reduction under this subparagraph, the Administrator may also reduce the applicable volume of renewable fuel and advanced biofuels requirement established under paragraph (2)(B) by the same or a lesser volume.

**(iii) Extensions**

If the Administrator determines that the feedstock disruption or circumstances described in clause (ii) is continuing beyond the 60-day period described in clause (ii) or this clause, the Administrator, in consultation with the Secretary of Energy and the Secretary of Agriculture, may issue an order to reduce, for up to an additional 60-day period, the quantity of biomass-based diesel required under subparagraph (A) by an appropriate quantity that does not exceed an additional 15 percent of the applicable annual requirement for biomass-based diesel.

**(F) Modification of applicable volumes**

For any of the tables in paragraph (2)(B), if the Administrator waives--

**(i)** at least 20 percent of the applicable volume requirement set forth in any such table for 2 consecutive years; or

**(ii)** at least 50 percent of such volume requirement for a single year,

the Administrator shall promulgate a rule (within 1 year after issuing such waiver) that modifies the applicable volumes set forth in the table concerned for all years following the final year to which the waiver applies, except that no such modification in applicable volumes shall be made for any year before 2016. In promulgating such a rule, the Administrator shall comply with the processes, criteria, and standards set forth in paragraph (2)(B)(ii).

**(8) Study and waiver for initial year of program**

**(A) In general**

Not later than 180 days after August 8, 2005, the Secretary of Energy shall conduct for the Administrator a study assessing whether the renewable fuel requirement under paragraph (2) will likely result in significant adverse impacts on consumers in 2006, on a national, regional, or State basis.

**(B) Required evaluations**

The study shall evaluate renewable fuel--

**(i)** supplies and prices;

Add. 016

**(ii)** blendstock supplies; and

**(iii)** supply and distribution system capabilities.

**(C) Recommendations by the Secretary**

Based on the results of the study, the Secretary of Energy shall make specific recommendations to the Administrator concerning waiver of the requirements of paragraph (2), in whole or in part, to prevent any adverse impacts described in subparagraph (A).

**(D) Waiver**

**(i) In general**

Not later than 270 days after August 8, 2005, the Administrator shall, if and to the extent recommended by the Secretary of Energy under subparagraph (C), waive, in whole or in part, the renewable fuel requirement under paragraph (2) by reducing the national quantity of renewable fuel required under paragraph (2) in calendar year 2006.

**(ii) No effect on waiver authority**

Clause (i) does not limit the authority of the Administrator to waive the requirements of paragraph (2) in whole, or in part, under paragraph (7).

**(9) Small refineries**

**(A) Temporary exemption**

**(i) In general**

The requirements of paragraph (2) shall not apply to small refineries until calendar year 2011.

**(ii) Extension of exemption**

**(I) Study by Secretary of Energy**

Not later than December 31, 2008, the Secretary of Energy shall conduct for the Administrator a study to determine whether compliance with the requirements of paragraph (2) would impose a disproportionate economic hardship on small refineries.

**(II) Extension of exemption**

Add. 017

In the case of a small refinery that the Secretary of Energy determines under subclause (I) would be subject to a disproportionate economic hardship if required to comply with paragraph (2), the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years.

**(B) Petitions based on disproportionate economic hardship**

**(i) Extension of exemption**

A small refinery may at any time petition the Administrator for an extension of the exemption under subparagraph (A) for the reason of disproportionate economic hardship.

**(ii) Evaluation of petitions**

In evaluating a petition under clause (i), the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors.

**(iii) Deadline for action on petitions**

The Administrator shall act on any petition submitted by a small refinery for a hardship exemption not later than 90 days after the date of receipt of the petition.

**(C) Credit program**

If a small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A), the regulations promulgated under paragraph (2)(A) shall provide for the generation of credits by the small refinery under paragraph (5) beginning in the calendar year following the date of notification.

**(D) Opt-in for small refineries**

A small refinery shall be subject to the requirements of paragraph (2) if the small refinery notifies the Administrator that the small refinery waives the exemption under subparagraph (A).

**(10) Ethanol market concentration analysis**

**(A) Analysis**

**(i) In general**

Not later than 180 days after August 8, 2005, and annually thereafter, the Federal Trade Commission shall perform a market concentration analysis of the ethanol production industry using the Herfindahl-Hirschman Index to determine whether there is sufficient competition among industry participants to avoid price-setting and other anticompetitive behavior.

**(ii) Scoring**

For the purpose of scoring under clause (i) using the Herfindahl-Hirschman Index, all marketing arrangements among industry participants shall be considered.

**(B) Report**

Not later than December 1, 2005, and annually thereafter, the Federal Trade Commission shall submit to Congress and the Administrator a report on the results of the market concentration analysis performed under subparagraph (A)(i).

**(11) Periodic reviews**

To allow for the appropriate adjustment of the requirements described in subparagraph (B) of paragraph (2), the Administrator shall conduct periodic reviews of--

**(A)** existing technologies;

**(B)** the feasibility of achieving compliance with the requirements; and

**(C)** the impacts of the requirements described in subsection (a)(2) [10] on each individual and entity described in paragraph (2).

**(12) Effect on other provisions**

Nothing in this subsection, or regulations issued pursuant to this subsection, shall affect or be construed to affect the regulatory status of carbon dioxide or any other greenhouse gas, or to expand or limit regulatory authority regarding carbon dioxide or any other greenhouse gas, for purposes of other provisions (including section 7475) of this chapter. The previous sentence shall not affect implementation and enforcement of this subsection.

**(q) [11] Analyses of motor vehicle fuel changes and emissions model**

**(1) Anti-backsliding analysis**

**(A) Draft analysis**

Not later than 4 years after August 8, 2005, the Administrator shall publish for public comment a draft analysis of the changes in emissions of air pollutants and air quality due to the use of motor vehicle fuel and fuel additives resulting from implementation of the amendments made by the Energy Policy Act of 2005.

**(B) Final analysis**

Add. 019